# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2894

_____

Guy Amir,

       Appellant,

    v.

St. Louis University,

       Appellee.

\* Appeal from the United States
\* District Court for the
\* Eastern District of Missouri.

_____

Submitted: March 11, 1999
Filed: July 26, 1999

_____

Before RICHARD S. ARNOLD, FLOYD R. GIBSON, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Guy Amir appeals from the district court's order granting summary judgment in favor of St. Louis University (SLU). Amir alleges that SLU retaliated against him in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203(a), by assigning him a failing grade in a psychiatry clinic and expelling him from SLU Medical School after he filed a grievance. Amir also alleges that SLU discriminated against him based upon his disability in violation of Title III of the ADA, section 504 of the Rehabilitation Act of 1973, and Missouri state law. We affirm the district court's

decision regarding the disability claim, but we reverse and remand on the retaliation claim.

# I.
# FACTS AND BACKGROUND

In 1991, Amir graduated from the University of Southern California in Los Angeles with a bachelor's degree in computer science. He was 19 years old when he graduated, and he earned his degree with magna cum laude distinction. In the fall of 1991, at the age of 20, Amir enrolled as a first year medical student at St. Louis University School of Medicine in St. Louis, Missouri. Amir's difficulties at SLU began prior to his matriculation in medical school.

After his acceptance but prior to his actual enrollment at SLU, Amir met with William Stoneman, M.D., the Dean of SLU Medical School. Dean Stoneman requested the meeting after receiving reports from secretaries and other SLU staff members who characterized Amir's behavior toward them as "arrogant." When Dean Stoneman telephoned Amir to arrange the meeting, the Dean was greeted by a "voice mail" recording from a "Dr. Shane First." Dean Stoneman asked Amir about the "Dr. Shane First" greeting. Amir told the Dean that he was in the process of legally changing his name to Dr. Shane First. When the Dean inquired about the reason for his name change, Amir became defensive and hostile. Dean Stoneman cautioned Amir not to represent himself as a physician. Dean Stoneman also commented on Amir's poor attitude and behavior. He suggested that Amir might be better suited for a profession that is "less demanding of compassion" and warned Amir that his attitude needed improvement. Dean Stoneman, however, did not initiate action to revoke Amir's admission to SLU Medical School.

Amir matriculated at SLU in the fall of 1991. Almost immediately upon his enrollment, Amir and a student from Washington University Medical School

reestablished the St. Louis chapter of an organization called the National Medical Society ("NMS"). In preparation for the reestablishment of this organization, Amir and other interested medical students met with former NMS members in the St. Louis area. One former member, Linda Schmitz, indicated that she was not interested in re-affiliating with NMS. In a casual conversation with Amir, however, Schmitz mentioned that she had box seat tickets to a St. Louis Cardinals baseball game. Amir and the other students then posted recruitment flyers, which listed Schmitz's name as an affiliate of NMS. One of the flyers also advertised free box seat Cardinals tickets. Schmitz and other former NMS members whose names were listed on the flyers sent a letter to the Dean of SLU in which they indicated that they did not want their names used to promote Amir's organization. Schmitz also stated in a separate letter that she did not offer her Cardinals tickets to Amir. SLU took no formal disciplinary action against Amir.

During his first year at SLU, Amir began experiencing academic difficulties. After failing his first biochemistry and anatomy exams, Amir asked to be placed in SLU's extended curriculum program. The extended curriculum program allows eligible students an extra year to complete their first year medical school studies. SLU initially refused Amir's request. After he failed to demonstrate sufficient progress in his second set of exams, however, SLU offered Amir the option of participating in the extended curriculum program or taking a leave of absence. Amir took a leave of absence.

Amir re-matriculated at SLU Medical School in the fall of 1992 as a first year medical student. Amir's second attempt at his first year yielded better academic results. Apparently, SLU Medical School issues grades consisting of Honors, Near Honors, Pass, Weak Pass, or Fail. However, grades of Near Honors and Weak Pass are recorded only on a student's internal grade records. Grades of Near Honors and Weak Pass are simply recorded as Pass on students' transcripts furnished outsiders. Amir's 1992-93 internal records reveal grades of Weak Pass in community medicine,

3

Near Honors in surgery research, and Honors in bioethics. The remainder of his grades were at the Pass level.

In his second year, Amir finished with grades of Weak Pass in neuroscience II, physical diagnosis and introduction to medicine. He earned Honors grades in working with the dying and medical communication skills. Again, the remainder of Amir's grades were at the Pass level.

In his third year, Amir began the clinical phase of his medical school education. He enrolled in internal medicine, OB/Gyn, pediatrics, psychiatry, and surgery. During his psychiatry rotation, Amir became overwhelmed with an excessive fear that his food, drink, and medicine were contaminated by poison. In response to his fear of poison, Amir forced himself to vomit and ingested laxatives in an effort to purge the perceived poison from his body. Amir's psychiatrist diagnosed him as suffering from severe obsessive compulsive disorder.[1] Amir told his supervisor at the SLU psychiatry clinic about his condition in hopes it would prompt the supervisor to render a more favorable review of Amir's performance in the clinic. Instead, the supervisor informed other physicians associated with the SLU clinic about Amir's disorder. In response, one physician, Robin Park, M.D., urged Amir to seek medical treatment through hospitalization. Amir contends that he opposed hospitalization because it would have interfered with his psychiatry rotation and it would have "expose[d] him to stereotyping or negative impressions" from his colleagues at SLU Medical School. (Appellant's Br. at 7.) Regardless, Amir signed a voluntary consent form and committed himself to hospitalization. Amir argues that Dr. Park threatened him with involuntary commitment and coerced Amir into admitting himself.

---

[1]Amir's psychiatrist had diagnosed Amir's obsessive compulsive disorder during his second year of medical school. The severity of the disorder apparently did not manifest itself until Amir's third and final year of medical school at SLU.

St. Louis Hospital treated Amir for conditions resulting from obsessive compulsive disorder. Upon his release from St. Louis Hospital, Amir sought re-admission to the psychiatry clinic. Dr. Park denied Amir's request. Dr. Park told Amir that his prolonged absence from the clinic precluded his return.

Amir filed a formal grievance against Dr. Park in which he sought re-admission to the psychiatry clinic. Despite the recommendation of several physicians, SLU Medical School's academic grievance committee denied his request. In his grievance, Amir alleged that Dr. Park coerced him into hospitalization and discriminated against him based upon his disorder. (Appellant's App. at 191-95.) The grievance committee rejected Amir's coercion and discrimination theories.

Despite his difficulties with the psychiatry clinic, Amir did earn grades of Pass in surgery, internal medicine ,and pediatrics. Amir, however, failed his OB/Gyn clinic after earning an extremely low score on his final exam. SLU allowed Amir to remediate his OB/Gyn clinic, and he earned a passing grade.

In October 1994, SLU Medical School's Committee on Student Progress and Program Planning ("CSPPP") allowed Amir to complete the last four weeks of his psychiatry clerkship under the direction of Dr. Park. Amir asked the CSPPP not to place him under Dr. Park's supervision. Amir believed that his accusations of coercion and discrimination had prejudiced Dr. Park and, consequently, she would not give him a fair evaluation. Amir asked the CSPPP to allow him to complete his clinical rotation at a hospital in Tel Aviv, Israel. The CSPPP denied his request. Amir completed the psychiatry clinic under the direction of Dr. Park.

After Amir initiated his grievance against Dr. Park but before he returned to the psychiatry clinic, the SLU psychiatry department instituted a new grading policy. Under the terms of the new policy, a student who attains "a combination of scores on multiple portions [of his clinical evaluations] which fall substantially below the

performance of other students and the expectations of the clerkship/department" may receive a failing grade in the psychiatry clerkship even if the student passes each portion of the rotation. (Appellee's App. at 357.) Amir's clinical evaluations consisted of four separate components. Amir passed all four components of the rotation. Dr. Park, however, assigned Amir a failing grade based upon the psychiatry department's new policy.

Following his failure in the psychiatry clinic, SLU Medical School took formal steps to dismiss Amir. On November 7, 1995, the CSPPP placed Amir on administrative leave while it investigated his eligibility to continue as a student at SLU. Amir asked the CSPPP to allow him to remediate the psychiatry clinic. The CSPPP refused his request. Amir then filed a formal appeal to the Dean alleging that Dr. Park was predisposed to fail him in retaliation for his earlier grievance against her. SLU Medical School's Associate Dean, Dr. Alberto Galofre, examined Amir's appeal and concluded that it lacked merit.

On November 9, 1995, Amir filed a complaint in district court. Amir alleged that SLU unlawfully retaliated against him, refused his request for reasonable accommodation, and discriminated against him based upon his disorder. Amir argued in his complaint that SLU's actions violated the ADA, section 504 of the Rehabilitation Act of 1973, and the Missouri Human Rights Act.

On January 12, 1996, the CSPPP recommended Amir's formal dismissal from SLU Medical School. Dr. Mary Ruh, chair of the CSPPP, provided in her letter to Amir that the recommendation for dismissal was "based on a history of poor academic performance and a long-standing history of inappropriate behavior, misrepresentations, and difficulties dealing with staff and faculty." (Appellee's App. at 346.) The letter also stated that Amir "received failing grades in Ob/Gyn and Psychiatry and ranked near the bottom of his class in overall performance in Surgery." (Id.) On January 18, 1996, another Associate Dean of SLU Medical School, wrote a letter formally

dismissing Amir. Amir appealed to the Executive Committee of the Faculty. On January 26, 1996, however, the Executive Committee denied Amir's appeal. After his dismissal from SLU, Amir enrolled at Fatima University Medical School in the Philippines where he earned his medical doctorate in 1997.

Amir amended his federal complaint to include allegations that SLU retaliated against him for filing a complaint in federal court and dismissed him based upon his disability. On February 19, 1998, the district court granted summary judgment in favor of SLU on Amir's claims that SLU discriminated against him based upon his disability and that SLU failed to provide him with reasonable accommodation. On June 12, 1998, the district court granted SLU's motion for summary judgment on the remaining claim after finding that no reasonable jury could conclude that SLU retaliated against Amir based upon participation in protected activities. Amir filed a timely appeal to this court.[2]

## II.
## DISCUSSION

This court conducts a de novo review of a district court's summary judgment determinations. See JN Exploration & Prod. v. Western Gas Resources, 153 F.3d 906, 909 (8th Cir. 1998). In conducting our review, we note that a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, reveal that there is no genuine issue of material fact suitable for submission to

---

[2]In his complaint before the district court, Amir offered other examples of protected activities. Each example was addressed by the district court in its summary judgment order. The claims lack merit and there is no need to reiterate them in the context of this opinion. See Eighth Circuit Rule 47B.

a jury.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The evidence presented must be viewed in a light most favorable to the nonmoving party, and the nonmoving party is entitled to the benefit of all reasonable inferences.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## A.
## Amir's Retaliation Claim

The ADA contains an anti-retaliation provision that prohibits discrimination against an individual because that individual "opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" conducted pursuant to the statute.  42 U.S.C. § 12203(a).

This court evaluates ADA retaliation claims under the burden-shifting framework announced in McDonnell Douglas Corp. v. Green,  411 U.S. 792 (1973), and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).  See Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998).

Under the McDonnell Douglas framework, a plaintiff claiming a violation of section 12203(a) of the ADA first must establish a prima facie case of retaliation.  In order to establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in a statutorily protected activity, (2) that an adverse action was taken against him, and (3) a causal connection between the adverse action and the protected activity. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc); Evans v. Kansas  City, Mo. Sch. Dist., 65 F.3d 98, 100 (8th Cir. 1995), cert. denied, 517 U.S. 1104 (1996).  A person cannot show that he engaged in a statutorily protected activity without first demonstrating that he had a good faith reasonable belief that the

8

alleged retaliator was engaging in discriminatory activity. See Evans, 65 F.3d at 100.

In the instant case, Amir satisfied the requirements for a prima facie case of improper retaliation under the ADA. Amir filed a grievance against Dr. Park in which he alleged that she coerced him into hospitalization and improperly prevented him from returning to the psychiatry clinic based upon his obsessive compulsive disorder. Filing such a grievance is a protected activity under the ADA as long as Amir had a reasonable good faith belief in the allegations contained in the grievance. It appears that Amir concluded in good faith that Dr. Park coerced him into hospitalization and then considered his disability as a factor in her decision not to readmit him to the clinic. Viewing the evidence in a light most favorable to Amir, his good faith belief in the genuineness of the allegations contained in his grievance is not unreasonable. Following the filing of Amir's grievance against Dr. Park, she assigned him a failing grade in the clinic. Hence, Amir satisfied the necessary showing of a causal connection between adverse action and the protected activity of filing a grievance.

Amir's other protected activity is the filing of the instant action against SLU. Again, such a suit is protected if Amir had a reasonable good faith belief that SLU engaged in discriminatory activity. In this case, Amir believed that Dr. Park assigned him a failing grade in response to his grievance. Viewed in a light most favorable to Amir, such a belief is not unreasonable. After filing his claim in federal court, SLU dismissed Amir. SLU's dismissal decision provides the necessary causal connection between the adverse action and the protected activity. Such a connection establishes a prima facie case of improper retaliation under the ADA.

Under the McDonnell Douglas framework, once a plaintiff establishes a prima facie case of improper retaliation, the burden then shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action. See Hicks, 509 U.S. at 506-07. In the instant case, SLU meets its burden. Unquestionably, Dr. Park assigned

9

Amir a failing grade in her course after he filed a grievance against her. Dr. Park asserts that she based her grading decision on the psychiatry department's new policy. Failing Amir because his passing performance on the four components of the clinic fell below the department's acceptable standards is a legitimate nondiscriminatory reason. Similarly, while SLU did dismiss Amir after he filed a complaint in federal court, SLU points out that Amir was facing the possibility of dismissal before he filed suit. He failed his psychiatry clinic. He initially failed his OB/Gyn clinic, and his record at SLU is littered with instances of misbehavior. Either Amir's academic difficulties or his behavioral problems, standing alone, provide a legitimate nondiscriminatory reason for his dismissal.

Once the defendant establishes a legitimate nondiscriminatory reason for the adverse action, the burden of production then shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination. See id. at 507-08. The ultimate burden of persuasion rests with the plaintiff at all points throughout the analysis. See id.

Viewing the evidence in a light most favorable to Amir, a genuine issue of material fact exists regarding the issue of pretext. While SLU's proffered evidence is compelling, it does not yield an inescapable conclusion that SLU did not retaliate against Amir. Amir filed a grievance against Dr. Park, in which he made serious allegations of coercion and discrimination. Dr. Park admitted that she was angered by these allegations. Shortly before Amir re-enrolled in the psychiatry clinic, the psychiatry department issued a new departmental policy that allowed a supervisor greater discretion in issuing a student a failing grade. Amir passed all the components of his clinic; yet, Dr. Park issued him a failing grade based upon the new policy. It is worth noting that the new grading policy was not instituted by SLU Medical School as a whole. Rather, it was a product of and used only by the psychiatry department. Dr. Park was the chairman of the psychiatry department. The fact that a policy was issued by the psychiatry department just before Amir returned to the clinic raises suspicion.

10

Similarly, Dr. Park's expansive discretion to issue a failing grade despite overall passing marks raises a question of possible retaliation. The question of retaliation is bolstered by the fact that the discretionary failing grade was issued by Dr. Park, a person who was angered by Amir's accusations.[3]

The fact question is enlarged by the filing of the complaint in federal court. SLU certainly had a basis for terminating Amir. If the basis for the dismissal was a failing grade due to an improper retaliation, however, then the dismissal as a whole was improper. There is no indication that SLU would have dismissed Amir absent his failure in psychiatry. Accordingly, the entire dismissal of Amir may have tainted origins. In addition, there is evidence that SLU might not have dismissed Amir absent his decision to file a lawsuit. Amir engaged in questionable conduct during the early stages of his academic career at SLU. Yet, SLU took no adverse action against him. Amir failed his courses during the first attempt at his first year; yet, SLU did not dismiss him. Amir's academic performance improved during his second attempt at his first year and throughout his second year. While Amir's performance certainly was not stellar, there is no indication that he faced a danger of dismissal. When Amir failed his OB/Gyn clinic, SLU allowed him to remediate the rotation. However, after he filed suit against the school, SLU refused to allow him to remediate his psychiatry rotation and decided to terminate him. This is evidence from which a reasonable jury could conclude that SLU engaged in improper retaliation. Finding a genuine issue of material fact as to whether SLU's and Dr. Park's actions constitute a pretext for discrimination, we must reverse the district court and remand this case for further proceedings not inconsistent with this opinion.

_____

[3]Dr. Park admitted that, other than Amir, she has not failed a student who passed all portions of the clinic. In addition, Dr. Park's first evaluation of Amir contained positive comments. The evaluation was conducted before Amir filed his grievance. A later version of the evaluation reveals that Dr. Park "crossed out" the positive remarks and added negative commentary. (See Appellant's App. at 255, 418 and 505.)

11

**B.**

**Amir's Disability Claim**

Amir alleges that SLU discriminated against him based upon his disability. Specifically, Amir contends that Dr. Park's decision not to readmit him to the psychiatry clinic, Dr. Park's decision to issue him a failing grade, and SLU's ultimate decision to dismiss him were motivated by his obsessive compulsive disorder.

Title III of the ADA prohibits any person who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of that individual's disability. See 42 U.S.C. § 12182(a) (1994). A person alleging discrimination under Title III must show (1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation. See 42 U.S.C. § 12182(a) and (b)(2)(A)(ii).[4]

A person is disabled within the meaning of the ADA if he demonstrates that he has a physical or mental impairment that substantially limits one or more of his major life activities, that he has a record of such an impairment, or that he is regarded as having such an impairment. See Land v. Baptist Med. Ctr., 164 F.3d 423, 424 (8th Cir. 1999); 42 U.S.C. § 12102(2)(A-C). Major life activities do not include those activities that, although important to the individual plaintiff, are not significant within the meaning of the ADA. See Land, 164 F.3d at 425 (holding that attending day care is not

---

[4]Missouri Human Rights Act claims are analyzed in the same manner as ADA claims. See Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1164 n.5 (8th Cir. 1998).

a major life activity); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998) (holding that gardening, golfing and shopping are not major life activities), cert. denied, 119 S. Ct. 1253 (1999). Major life activities do include functions such as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 36.104.

In the instant case, the district court found that Amir suffers from a disability because his obsessive compulsive disorder "affects his ability to eat and drink without vomiting, his ability to concentrate and learn, and his ability to get along with others." (Dist. Ct. Ord. at 18; Appellant's App. at 577.) While it is questionable whether the latter category constitutes a major life activity within the meaning of the ADA, eating, drinking, and learning are major life activities. Accordingly, we agree with the district court's conclusion that Amir is disabled within the meaning of the ADA.

Once a person shows that he is disabled within the meaning of the ADA, he next must prove that the defendant falls under the statutory definition as a provider of a public accommodation. Title III of the ADA prohibits discrimination on the basis of a disability by any person "who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). An undergraduate or postgraduate private school is a place of public accommodation. 42 U.S.C. § 12181(7)(J). In the instant case, St. Louis University maintains both an undergraduate division as well as graduate programs in such areas as law, business, and medicine. Hence, it is a place of public accommodation under the ADA.

After a plaintiff proves that he is disabled and that the defendant fits the statutory public accommodation definition, the plaintiff then must demonstrate discrimination based upon his disability. See Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432, 435 (6th Cir. 1998). In this case, Amir did not provide sufficient evidence from which a reasonable jury could conclude that SLU's adverse decisions were based upon his disability.

13

Although Amir alleges disparate treatment and cites instances where students were allowed to return to a clinic after hospitalization or where students were not dismissed after receiving a failing grade, he fails to show that these instances involved similarly situated individuals. In addition, Amir has proffered no evidence from which a reasonable trier of fact could conclude that his disability was the motivating factor behind SLU's adverse action. At best, Amir raises a question about the true nature of SLU's decisions. For example, Dr. Park refused to allow Amir to return to the clinic because of the length of time that he spent away from the rotation. Nothing in the record even suggests that Amir's disability was the impetus behind her decision. In regard to the failing grade, there is no indication that Dr. Park failed him because he suffered from obsessive compulsive disorder. While Dr. Park was angry with Amir for filing a grievance against her, her anger suggests a possible motive for retaliation but does not raise a reasonable inference of discrimination based upon a disability. Even if Dr. Park coerced Amir into hospitalization, such an act does not establish that her subsequent adverse actions were motivated by Amir's disability. Similarly, there is no evidence that SLU's decision to terminate Amir was disability based. After discovering that Amir had obsessive compulsive disorder, SLU took no action to dismiss him until after he failed his psychiatry clinic and filed a lawsuit. Either reason might have served as the basis for his dismissal. The former reason is nondiscriminatory; the latter reason is barred by the ADA's retaliation provision and the case is being remanded for further proceedings on that basis. In this case, there is simply a lack of evidence that Amir's disability served as a factor motivating any of SLU's adverse decisions. Accordingly, the district court correctly granted summary judgment on this issue.

## C.
### Accommodation Requests

The ADA requires a provider of a public accommodation to modify its program to accommodate the needs of a disabled person unless such a modification will substantially alter the nature of the program or such a modification constitutes an undue

14

burden.  See Roberts v. Kindercare Learning Ctrs., Inc., 86 F.3d 844, 846 (8th Cir. 1996).  When the accommodation involves an academic decision, "[courts] should show great respect for the faculty's professional judgment." Regents of University of Michigan v. Ewing, 474 U.S. 214, 225 (1985).

In this case, Amir essentially suggests three forms of accommodation.  First, he asked to complete the psychiatry clerkship at an institution other than SLU.  Second, he sought a passing grade in psychiatry, and third, he requested that he not be assigned to Dr. Park.  None of these requests amount to a reasonable accommodation under the ADA.

Although Amir's treating physician stated that finishing the clinic at SLU might exacerbate Amir's obsessive compulsive disorder, SLU argues that it did not allow Amir to complete the clinic at another university because he was struggling academically.  Pursuant to SLU policy, students experiencing academic difficulties are not allowed to attend classes at other universities.  Such a policy does not appear discriminatory or unreasonable, and we will not second guess SLU's academic policy.

Similarly, SLU's decision not to assign Amir a passing grade based upon his prior work in the psychiatry clinic does not appear discriminatory or unreasonable.  It is an academic decision.  We will not invade a university's province concerning academic matters in the absence of compelling evidence that the academic policy is a pretext for discrimination. See id.  No such inference can be drawn in the present case.

Finally, there is no indication that SLU's decision to reassign Amir to Dr. Park was related to Amir's disability.  There is no suggestion from Amir's physicians that working with Dr. Park would worsen Amir's condition.  Amir did not request to be assigned to another clinical supervisor based upon his disability; he asked for someone other than Dr. Park because he feared retaliation.  Arguably, it may have been imprudent for SLU to reassign Amir to Dr. Park after Amir had filed a grievance

against her, but Amir's request for another supervisor was not a reasonable accommodation under the ADA because it was not disability related. Hence, Amir's reasonable accommodation claim must fail.[5]

**CONCLUSION**

For the reasons stated herein, we affirm the district court's summary judgment order regarding the disability discrimination and reasonable accommodation claims. We reverse the district court's order regarding the retaliation claims and remand this matter to the district court for further proceedings not inconsistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[5]Amir also alleges discrimination in violation of section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 701-976. Rehabilitation Act claims are analyzed in a manner similar to ADA claims except that the Rehabilitation Act imposes a requirement that a person's disability serve as the sole impetus for a defendant's adverse action against the plaintiff. See Maddox v. University of Tennessee, 62 F.3d 843, 846 (6th Cir. 1995); 29 U.S.C. § 794(a). The heightened requirements contained in the Rehabilitation Act preclude Amir's recovery on this cause of action.