# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3258
_____

Thomas Rossley, Jr.

*Plaintiff - Appellee*

v.

Drake University, et al.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines
_____

Submitted: November 12, 2019
Filed: November 5, 2020
_____

Before COLLOTON, WOLLMAN, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Drake University and its Board of Trustees (Drake) expelled student Thomas Rossley, Jr. after university officials found that he had sexually assaulted a female student (hereinafter referred to as Jane Doe or Doe). Rossley sued Drake in an eight-count complaint, which alleged, as relevant here, violations of Title IX and the Americans with Disabilities (ADA), as well as claims related to breach of contract.

The district court[1] granted summary judgment in favor of Drake on all but Rossley's Title IX claim based on a selective enforcement theory and his breach of contract claim based on Drake's failure to investigate his allegation of sexual misconduct on Doe's part. Rossley v. Drake Univ., 342 F. Supp. 3d 904 (S.D. Iowa 2018). Following the district court's ruling, the parties stipulated to the dismissal without prejudice of those two claims. On appeal, Rossley challenges the district court's grant of summary judgment on his Title IX claim based on an erroneous outcome theory, his ADA claim, and his breach of implied duty of good faith and promissory estoppel claims.

We address first whether we have jurisdiction to review Rossley's appeal in light of the stipulated dismissal of the two above-described claims. We have "jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291; see Ruppert v. Principal Life Ins. Co., 705 F.3d 839, 842-43 (8th Cir. 2013). When a district court dismisses a claim "*without* prejudice pursuant to the parties' stipulation," there is "no final decision" for purposes of appellate jurisdiction. W. Am. Ins. Co. v. RLI Ins. Co., 698 F.3d 1069, 1071 n.1 (8th Cir. 2012). During oral argument before us, however, Rossley agreed to dismiss these claims with prejudice. We accordingly conclude that we have jurisdiction to consider the appeal. See Ruppert, 705 F.3d at 843 ("[U]nless the appellant's claims are unequivocally dismissed with prejudice, there is no final appealable decision.").

We review *de novo* the district court's grant of summary judgment dismissing Rossley's Title IX, ADA, breach of implied duty of good faith, and promissory estoppel claims. See Quinn v. St. Louis Cty., 653 F.3d 745, 750 (8th Cir. 2011) (standard of review). Summary judgment is appropriate if, when the record is viewed in the light most favorable to the nonmoving party, there are no genuine disputes of

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

material fact and the moving party is entitled to judgment as a matter of law. Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "We may affirm the district court's grant of summary judgment on any ground supported by the record." Id.

Drake, a private university in Des Moines, Iowa, receives federal funding. Two documents govern Drake's sexual assault investigations and disciplinary hearings: the Code of Student Conduct (Code) and the Sexual and Interpersonal Misconduct Policy and Notification of Complainant's Rights (Policy). The Code proscribes certain forms of misconduct, including sexual misconduct. It states that Drake may "take whatever disciplinary action is appropriate (up to and including expulsion from the University) to protect the safety and well-being of students." The Policy addresses Drake's policies and procedures relating to sexual and interpersonal misconduct and is "intended to ensure that [these policies] are interpreted and applied consistently with Title . . . IX." The Policy also "notif[ies] victims/survivors of their rights and resources that are available to them" and "explains the investigatory and disciplinary procedures . . . and possible sanctions" Drake may impose.

The Code and Policy define sexual assault as "an extreme form of sexual misconduct ranging from forcible rape to nonphysical forms of pressure that compel individuals to engage in sexual activity against their will." Sexual assault includes "[e]ngaging in sexual activity with a person who is unable to provide consent due to the influence of drugs, alcohol, or other condition[s]." The Policy defines "consent" in the context of sexual activity as "clear, unambiguous action, agreeing, giving permission or saying 'yes' to sexual activity with someone else." The Policy states that "an individual cannot give consent if incapacitated from doing so due to the influence of . . . alcohol."

The Code provides that any student or staff member may file a complaint against a student suspected of sexual misconduct by contacting the Dean of Students Office or the Title IX Coordinator. The Dean of Students is assigned the responsibility of overseeing the investigation of the complaint. The individuals who coordinate and investigate the complaint shall have "received special training or have experience in (1) handling complaints of sexual and/or interpersonal misconduct; and (2) applicable confidentiality requirements." Both the complainant and the accused student are advised that they may have a "personal advisor" present "at any stage of the process," including at "any meeting or hearing." Formal disciplinary proceedings may be initiated if the Dean forms a "reasonable belief that the charge . . . can be proven by a preponderance of the evidence.

The hearing officer at the disciplinary hearing "shall determine (1) whether a preponderance of the evidence establishes the accused student engaged in . . . misconduct; and (2) recommended disciplinary sanction(s), if any." "The accused, the complainant and Dean/designee may call witnesses, conduct cross-examination, and may answer any evidence presented by others through rebuttal." The accused's personal representative's sole role is to "provide counsel and advice." An attorney personal representative may "make an opening statement, a closing argument and may present written questions to be read by the hearing officer to a witness." The complainant and accused may cross-examine witnesses, but may not cross-examine one another. Rather, the hearing officer will pose to the adverse party the questions that each party has submitted, as well as asking such questions as the hearing officer may decide to pose at any time. The hearing officer will provide to all parties a post-hearing written opinion.

The accused student may appeal any adverse finding and proposed sanction by requesting a hearing before a three-member appeals panel, at which the appeals panel will "meet with the appealing and responding parties (and their personal representatives, if any) for the purpose of hearing argument." If the appeals panel

-4-

determines that none of the enumerated grounds for an appeal has been shown, the appeal is dismissed and the hearing officer's decision becomes final. If the appeals panel finds a showing of grounds for an appeal, the panel may affirm or reverse the hearing officer's decision or modify the sanction imposed. If the President of Drake concurs with the panel's findings, the Dean "shall have the authority to impose the sanction of expulsion," and only the President "may recommend readmission."

The district court's comprehensive opinion sets forth a detailed account of the interactions between Rossley and Jane Doe that resulted in the expulsion from Drake that led to this appeal. Our summary of those events follows.

Jane Doe, a female student at Drake, contacted Drake Public Safety on October 9, 2015, to report that Rossley had sexually assaulted her earlier that morning. She reported that she had consumed a large amount of alcohol, "blacked out" for an "unknown amount of time," and next remembered being on a bean bag chair in Rossley's room, with Rossley being on top of and having intercourse with her. Drake Public Safety filed Doe's report with Gerald Parker, the acting Dean of Students. Rossley was sent a letter notifying him of the complaint of sexual misconduct and requiring him to attend a later-scheduled meeting regarding the complaint, to which he could "bring a personal representative." Because Dean Parker was ill at the time, Drake employed Mary Howell Sirna to serve as the lead investigator. Sirna had been a prosecutor for thirteen years, during which time she prosecuted sexual violence crimes and served as Iowa State University's interim Title IX coordinator. She had also received training on handling students' complaints of sexual assault. Sirna worked with similarly trained Tricia McKinney, Drake's Assistant Director of Public Safety, in conducting the investigation.

Sirna and McKinney interviewed Doe and Rossley separately on October 23, 2015. Rossley did not bring a personal representative with him to the meeting and admitted that he had not finished reading the email that informed him of his right to

do so. Sirna questioned Rossley about the evening of October 8 and early morning of October 9. Sirna and McKinney interviewed twelve witnesses and collected documentary evidence during the course of their investigation. Sirna chose not to interview any additional witnesses, believing that their statements might be duplicative.

Dean Parker and Drake's Title IX Coordinator met with Rossley a month later. Rossley said that a friend had told him that Rossley might have been a victim of sexual assault, as Rossley himself did not remember the event. At a meeting with Sirna and McKinney the following day, Rossley reiterated that perhaps he had been a victim of sexual assault. Sirna asked Rossley if he wanted to file a sexual assault charge against Doe, to which Rossley replied, "I'm not doing that right now. I'm just verbalizing the issue."

Sirna's investigative report to Parker, Rossley, and Doe set forth the following account: Rossley said that he and Doe had exchanged text messages and were friends, but had not "hung out one on one." To help him focus on an assignment that he was working on the evening of October 8, Rossley took his prescribed ADHD/dyslexia medication. After completing the assignment, Rossley played a drinking game with friends, resulting in his becoming "pretty drunk." Rossley explained that his medication often extends his sobriety, lowers his sex drive, and exacerbates the severity of any resulting blackout.

Sirna and McKinney found that Doe believed that she was intoxicated when she arrived at the bar at which she had met Rossley on the evening of October 8. Bar witnesses stated that Doe was noticeably drunk, including a bartender who recalled having refused to serve Doe because of her intoxicated condition. Rossley recalled thinking that he himself was "more drunk tha[n] [Doe] was" and that Doe was acting in a "flirty way" towards him. Doe agreed with Rossley's suggestion that they leave the bar. A fraternity brother (the driver of the "sober cab," whose bounden duty it

was to transport his intoxicated brethren to the fraternity house) picked them up at Rossley's request. Doe stated that once she and Rossley left the bar, things became "blurry." Rossley stated that he could not remember what had happened in the car, but a witness reported seeing him and Doe "making out." Rossley alleges, and the fraternity brother so stated, that Doe asked to go to the fraternity house at which Rossley resided.

Witnesses observed Doe "stumbling over herself" when she and Rossley reached the fraternity house. Doe remembered throwing up upon entering the house, after which point "everything [went] black." Doe and Rossley then went to Rossley's room, where they found two fraternity members playing video games. Rossley stated that Doe asked if he had a car and suggested that the two go there. Rossley remembered Doe's performing oral sex on him in the car before he blacked out. He stated that he did not believe he had ejaculated. Doe and Rossley then left the car and returned to the fraternity house.

Rossley stated that his last memory involving Doe once they were back in his room was her standing on a chair near his bed. He remembered her kissing him good night and leaving. He stated that he was "confused about the situation" and did not "know what happened" or whether they "had sex." He stated that his night with Doe did not result in the post-intercourse pain he suffers as a result of a back injury. Rossley also stated that Doe had complained to a friend about Rossley's inability to ejaculate. Rossley's roommate, who was present in the room during the alleged assault, reported that he remembered Rossley and a girl walking into the room, but did not recall hearing anything indicative of sexual activity.

Sirna and McKinney's report stated that Doe next remembered waking up to Rossley's being "on top of [her] and assaulting [her]." She reported as having been confused and asking herself, "How did I get here," as well as thinking that she was "not passed out and [Rossley's] having sex with me." She remembered that they were

-7-

having penetrative intercourse, as she had felt his weight on her. After pushing him off her body, she noticed that he was wearing a yellow condom, that her pants were pushed down, and that her underwear had been "pushed to the side." Doe remembered telling Rossley to "get off of [her]" and his saying, "Fine. I've got whiskey dick anyway." Rossley told Doe not to leave, to which she responded by saying, "I'm going to be sick" and running to the bathroom.

Doe recalled sending a text message to another witness while in the bathroom, asking if she could sleep on his couch. Receiving no response, she went to the witness's house and started kissing him. The witness recalled that Doe appeared to be intoxicated, but not "overly intoxicated." Doe expressed having felt "weird around [Rossley]" and that Rossley "was being weird." At 3:59 a.m., October 9, Rossley sent a "Make it back?" text to Doe, to which she responded, "Yeah I'm good thx babe."

Upon returning to her apartment, Doe asked friends to help her recreate the events of the previous evening and the remainder of the night. At midmorning, she filed a report against Rossley with Drake Public Safety and went to Mercy Hospital, where she received a preliminary exam. She reported "freaking out" and doubting herself, wondering whether she had consented, if she was wrong, or had made a mistake. She declined to undergo a forensic exam. When asked about her doubts, Doe replied that she did not recall giving consent and did not think she was capable of doing so. She stated that she had noticed blood stains on the underwear that she was wearing that night. Neither the underwear nor Doe's medical record was made available to Sirna during the investigation.

When asked by Sirna about Doe's account, Rossley replied that in addition to the oral sex in the car, he remembered only Doe's kissing him goodbye. A witness reported, however, that Rossley had said that he had "hook[ed] up" with Doe and had "wasted a condom" because he could not ejaculate.

Sirna determined that a reasonable person could conclude "based on the preponderance of the evidence" that Rossley had engaged in the sex act alleged in Doe's complaint. Sirna wrote that "given that there are no eye witnesses to the event, and [Rossley] claims not to recall the event we then must turn to the evidence provided by [Doe]." She pointed to the testimony regarding Doe's incapacitated state, as well as to Rossley's contradictory admission to a friend that he had had intercourse with Doe despite his inability to ejaculate—an admission supported by Doe's recollection of Rossley's statement that he was suffering from alcohol-induced erectile dysfunction. Sirna also noted that Rossley seemed to have been less incapacitated than Doe. Moreover, she found Doe credible in light of the statements she had made to investigators "against her own interest," including her expression of self-doubt and the fact that she had engaged in sexual activity with a different person after the assault. Sirna's report mentioned Rossley's thought that he himself might have been a victim of sexual assault, but she made no findings regarding that allegation. After reviewing Sirna's report, Dean Parker determined that a disciplinary hearing was warranted and so informed Rossley.

Later that month, Rossley's father, then a Drake Trustee, called Parker, who told him that Rossley's case would be moving to a formal hearing. Rossley's father expressed concern that the investigators had refused to investigate his son's claim of having been sexually assaulted on the ground that it would have constituted a retaliatory action. He demanded that Parker accommodate Rossley's disabilities during the upcoming hearing.

Jerry Foxhoven, who had received training on sexual misconduct investigations, was Drake's hearing officer at the time. Foxhoven determined that there would be three parties at the hearing: Rossley, Doe, and Parker, who would be acting as the Dean. Rossley argued through his representative that because Parker and Doe were on the same "side," it was unfair to give equal time to all parties. Foxhoven ruled that Doe and Rossley could have five minutes for opening statements

-9-

and ten minutes for closing statements, while Parker could have five minutes for opening and closing but could not make statements that were cumulative of Doe's.

Foxhoven notified the parties and their representatives that he would not admit "any testimony or evidence of the prior sexual conduct or mental health issues of either" Doe or Rossley. Rossley's representative argued that evidence regarding Doe's post-Rossley encounter performance of oral sex on another person should be admissible as probative of her state of mind on that night and her capacity to consent mere hours earlier. Foxhoven then ruled that this evidence would be admitted.

Parker stated during his opening statement at the disciplinary hearing that the Dean of Students Office had "found [Doe's] account of this incident as being more credible" and recommended that "the appropriate sanction be expulsion." Rossley's representative argued during his opening statement that "the two people involved were both blackout drunk," but later during the statement argued that "we can know that [Doe] was not incapacitated." Foxhoven interpreted the opening statement as an admission by Rossley that Doe was incapacitated during the time in question, rending the extent of her incapacitation uncontestible. Foxhoven accordingly amended his previous order by precluding any testimony and evidence regarding Doe's actions after leaving Rossley's room.

In addition to Doe's and Rossley's testimony, eleven witnesses testified and were cross-examined during the hearing, with Foxhoven reading Doe's and Rossley's respectively submitted questions. In addition to reiterating that which she had told investigators regarding the events of October 8 and 9, Doe testified that in an attempt to persuade Rossley to take her to her home, she had provided that which she knew he wanted by "giving him oral sex" while the two were in the back seat of his car. She denied having initiated or consented to having vaginal intercourse.

-10-

Foxhoven's order stated that sufficient evidence existed to support a finding of sexual misconduct. Although he noted "a lack of definitive evidence" in light of the absence of corroboration, as well as the lack of any test conducted on Doe's underwear, Foxhoven ultimately concluded that the remaining evidence was sufficiently probative of his findings. He first determined that "a preponderance of evidence supports the fact that vaginal intercourse between [Doe] and [Rossley] was either attempted or completed on the evening in question," noting that the Code provides that contact with genitals without consent constitutes sexual assault. Foxhoven pointed to Doe's not being "conscious during the assault," awakening to Rossley's "violating" her while her pants were off, later remembering Rossley's mentioning his alcohol-induced erectile dysfunction, and her stating that "walking was painful in a way that indicated to her that she had been subjected to vaginal sex." Foxhoven also determined that "a preponderance of evidence supports the fact that [Doe] did not give her consent to the sexual contact in question" because she was "so intoxicated . . . that she was rendered unable to give her consent." He pointed to Doe's pain-resulting experiences with penetrative sex, to the testimony from numerous witnesses, and to Rossley's representative's statement that both Rossley and Doe were "blackout drunk on the night in question."

Foxhoven rejected Rossley's argument that he should not be responsible for his conduct because he was "blacked out." Foxhoven concluded that the evidence showed that Rossley was "clearly more in control of himself than [Doe was]" and that he was aware of her level of intoxication. Foxhoven did not address Rossley's allegation that he had not consented to Doe's performance of oral sex on him before his alleged assault on her.

Foxhoven recommended that Rossley be expelled, rejecting Rossley's representative's request that Rossley be allowed to graduate as planned just a month later and emphasizing Rossley's awareness of Doe's intoxicated state.

-11-

Upon receiving Rossley's notice of appeal, the appeals panel scheduled a hearing, following which the panel affirmed Foxhoven's findings and recommended expulsion. Parker notified Rossley of the panel's decision and of Drake's President's concurrence therein, as well as of Rossley's immediate expulsion from the university. Rossley then filed the action that gave rise to this appeal.

Title IX prohibits federally funded universities from discriminating against students on the basis of sex. See 20 U.S.C. § 1681(a). As relevant here, Rossley pursued his Title IX claim under the two categories set forth in Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994)—"selective enforcement" and "erroneous outcome."[2] With respect to erroneous outcome, Rossley argued that there was a genuine dispute of material fact whether gender bias had resulted in an erroneous outcome in his disciplinary proceedings. See id. at 715 (explaining that the erroneous outcome category involves claims that "the plaintiff was innocent and wrongly found to have committed the offense"). The district court applied Yusuf and dismissed Rossley's Title IX claim to the extent it was based on an erroneous outcome theory. As set forth above, Rossley decided to dismiss with prejudice the remainder of his Title IX claim so that he could obtain final judgment and appellate jurisdiction.

Subsequent to the submission of Rossley's appeal, we announced the following pleading standard for Title IX claims: a plaintiff "must allege adequately that the University disciplined [the plaintiff] on the basis of sex—that is, because he is a

_____

[2]We had not applied or adopted the Yusuf framework at the time of the district court's ruling on Drake's summary judgment motion, but a number of courts of appeals had done so. E.g., Robinson v. Wutoh, 788 F. App'x 738, 738 (D.C. Cir. 2019) (per curiam); Klocke v. Univ. of Tex., 938 F.3d 204, 210 (5th Cir. 2019); Austin v. Univ. of Or., 925 F.3d 1133, 1138 (9th Cir. 2019); Doe v. Loh, 767 F. App'x 489, 491 (4th Cir. 2019) (per curiam); Doe v. Valencia Coll., 903 F.3d 1220, 1236 (11th Cir. 2018); Doe v. Trs. of Bos. Coll., 892 F.3d 67, 90 (1st Cir. 2018); Doe v. Miami Univ., 882 F.3d 579, 592 (6th Cir. 2018).

male." Doe v. Univ. of Ark.-Fayetteville, 974 F.3d 858, 864 (8th Cir. 2020).  In so holding, we cited the Seventh Circuit's decision in Doe v. Purdue University, 928 F.3d 652, 667-68 (7th Cir. 2019), which rejected Yusuf's categories of Title IX claims and asked instead whether "the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex.'"  The court explained that Yusuf's categories "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." Doe v. Purdue Univ., 928 F.3d at 667.[3]

To survive summary judgment, then, Rossley was required to set forth sufficient evidence to allow a reasonable jury to find that Drake disciplined him on the basis of sex.  See id.; Doe v. Univ. of Ark.-Fayetteville, 974 F.3d at 864.  The district court's application of Yusuf is of no consequence, however, in light of its ultimate conclusion that no reasonable jury could find that Drake's "actions were motivated by gender bias." Rossley, 342 F. Supp. 3d at 926.  As explained below, we similarly conclude that there is no genuine dispute of material fact whether being male was a motivating factor for Rossley's expulsion from Drake.

Rossley advances several theories in support of his argument to the contrary. Specifically, he contends that:  (1) Drake countenanced various procedural flaws in the investigation, disciplinary hearing, and appeals process and reached a decision against the weight of the evidence; (2) Drake's "victim-centered" approach punishes male respondents; (3) gender-specific data of those accused of sexual misconduct at

---

[3]The United States Courts of Appeals for the Third and Ninth Circuits have adopted the Seventh Circuit's pleading standard. Schwake v. Ariz. Bd. of Regents, 967 F.3d 940, 947 (9th Cir. 2020); Doe v. Univ. of the Scis., 961 F.3d 203, 209 (3rd Cir. 2020); see also Doe v. Univ. of Denver, 952 F.3d 1182, 1190 (10th Cir. 2020) (considering whether the plaintiff had adduced "sufficient evidence to raise a genuine dispute that gender was a motivating factor in [the university's] decision to expel him").

Drake reveals gender bias; and (4) the Department of Education's guidance document (the "Dear Colleague" letter—of which more later) pressured Drake to protect female victims at the cost of erring against accused male students.

Rossley argues that he has shown a genuine dispute whether Drake's actions during the investigation and disciplinary hearing were motivated by gender bias. He points to alleged flaws in Drake's decisions throughout the disciplinary process, including Foxhoven's decision allowing Doe and Drake separate time in the hearing, the requirement that Rossley and Doe conduct their own cross-examination of certain witnesses, and Foxhoven's reliance on Doe's unverified statements regarding intercourse-induced pain. He argues that the appeals panel failed to take into account his imminent graduation date, condoned the decision to allow both Doe and Drake to proceed against him, and viewed only the evidence presented to it.

The Code and Policy processes Rossley challenges use gender-neutral language. As recounted above, the Policy allows the accused student's representative to be present during the disciplinary hearing for the purpose of making opening and closing statements and presenting questions to the hearing officer. The accused student is given the opportunity to submit a written response to the complaint. We conclude that these procedures, although not equivalent to those provided in non-academic settings, are not reflective of gender bias, either in statement or in application.

Rossley contends that the hearing panel reached decisions contrary to the weight of the evidence, which he argues demonstrates that gender bias permeated the investigation, the hearing, and the decision that resulted in his expulsion. He points to Sirna's decision to not interview certain witnesses, her reliance on hearsay, and her finding that Rossley's roommate lacked credibility. He points also to Foxhoven's and the appeals panel's reliance on the alleged erroneous findings that flowed from Sirna's flawed investigation. We conclude, however, that whatever the deficiencies

-14-

in Sirna's investigation, they did not result in findings so devoid of substantive content as to be unworthy of credence. As pointed out earlier, for example, Sirna's decision not to interview certain witnesses was based on her belief that such an effort might prove to be duplicative of her other interviews. Likewise, the alleged deficiencies did not rise to the level of the "clear procedural irregularities" that occurred in Menaker v. Hofstra University, 935 F.3d 20, 35 (2nd Cir. 2019).

We also find to be without merit Rossley's argument that the decision regarding Doe's alcohol-impaired decision-making capacity was contrary to the substantial weight of the evidence. True enough, as was also the case in Doe v. University of Arkansas-Fayetteville, 974 F.3d at 864-65, Doe was able to converse, to send text messages (including a post-encounter thank-you reply), and to return safely to her apartment, but there was also substantial, if indeed not overwhelming evidence of her intoxication that greatly exceeded that which existed in the Arkansas case.

Rossley argues that a university official's actions during a disciplinary process can raise a plausible inference of gender bias. See, e.g., Doe v. Purdue Univ., 928 F.3d at 669 (crediting female accuser "on her accusation alone" and taking "no other evidence into account" raised a plausible inference of gender bias); Doe v. Columbia Univ., 831 F.3d 46, 57 (2d Cir. 2016) ("When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias."); Prasad v. Cornell Univ., No. 5:15-cv-322, 2016 WL 3212079, at *17 (N.D.N.Y. Feb. 24, 2016) (holding that allegations of a slanted investigative report, a drastic change in position by one investigator, and a possibility that male respondents are invariably found guilty at the university "plausibly establishes a causal connection between gender bias and the outcome of [plaintiff's] disciplinary proceeding"); Doe v. Washington & Lee Univ., No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (holding

that investigators' omissions in witness summaries and failure to consider evidence of plaintiff and accuser's post-incident consensual sexual encounter "plausibly established a causal link between [plaintiff's] expulsion and gender bias"). Whatever force similar arguments might have in a given case, we conclude that Rossley has failed to make a sufficient showing that the procedural or substantive deficiencies that he alleges occurred in his case were the equivalent of those in these cases.

As was also the situation in Doe v. University of Arkansas-Fayetteville, the cases Rossley cites were being considered at the pleadings stage of the proceedings. They also concerned allegations more probative of gender bias than any of the evidence Rossley points to here. In Doe v. Columbia University, the court noted that "substantial criticism" attacking the manner in which the university treated female accusers could motivate officials "to refute those criticisms by siding with the accusing female and against the accused male." 831 F.3d at 57-58. In Doe v. Purdue University, the dean of students and Title IX Coordinator reached a decision without ever having spoken with the complainant, and the university center dedicated to supporting victims of sexual violence had posted an article insinuating that men were "the cause of campus sexual assault." 928 F.3d at 669. Similarly, in Doe v. Washington & Lee University, the court held that "gender bias could be inferred" from the Title IX Coordinator's hosting a presentation that endorsed the idea "[a]lmost [e]very [g]irl" experiences non-consensual sex. 2015 WL 4647996, at *10. In Prasad v. Cornell University, the district court noted that it had to accept as true plaintiff's allegation of "a gender stereotype adverse to males charged with sexual assaults . . . at Cornell causing . . . disciplinary proceedings to 'invariably' end adversely to male respondents." 2016 WL 3212079, at *16. We conclude that Rossley has not established the existence of any comparatively similar facts in his case.

Rossley contends that in addressing allegations of sexual misconduct, Drake officials employ a "victim-centered approach" rooted in "bad science," in which they

"rationalize away" behavior "plainly inconsistent with a sexual assault having occurred." Rossley, 342 F. Supp. 3d at 927 (citing Rossley's brief in opposition to summary judgment). Although Drake itself does not use the term "victim-centered," Rossley infers its existence from the literature Drake provides on resources for sexual assault survivors, as well as from the Policy's information on prevention and awareness of assault. As the district court observed, however, the language in the Policy is gender-neutral and Sirna and McKinney used gender-neutral language in describing why victims may engage in counterintuitive behavior following a sexual assault. Whatever descriptive phraseology one might use to characterize Drake's approach in dealing with sexual misconduct cases, we do not believe that it can fairly be found to be inherently gender-biased. See Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); Haley v. Va. Commonwealth Univ., 948 F. Supp. 573, 579 (E.D. Va. 1996) (explaining that certain allegations "at best reflect bias against people accused of sexual harassment and in favor of victims and indicate nothing about gender discrimination").

Rossley asserts that the "norm" of female complainant and male accused at Drake and nationwide show gender bias. Rossley alleges that all fifty-one persons accused of sexual misconduct at Drake during the 2015-16 academic year were male. Although Drake points out that in several of the cases there is no evidence regarding the accused student's gender, we agree with the district court that even assuming that all of the cases involved males, the data does not demonstrate gender bias.

Again, Rossley bases his argument on cases that were being considered at the pleadings stage of the proceedings. In Doe v. Miami University, the Sixth Circuit held that it was plausible to infer gender bias from the evidence that every male student accused of sexual misconduct had been found responsible for the alleged

-17-

sexual misconduct, from the fact that ninety percent of the students found responsible for such conduct between 2011 and 2014 had male names, and from an attorney's affidavit that the university pursued investigations involving only male students. 882 F.3d at 593-94. The Sixth Circuit also expressed its cautiousness, however, observing that "[d]iscovery may reveal that the alleged patterns of gender-based decision-making do not, in fact, exist. That information, however, is currently controlled by the defendants." Id. at 594. Drake has produced its evidence, however, and the statistical account does not on its own, nor in conjunction with Drake's "victim-centered" approach and the hereinafter discussed "Dear Colleague" letter, demonstrate a pattern of preordained gender-based decision-making. We concur in the First Circuit's assessment in Doe v. Trustees of Boston College that "[i]t is unreasonable to draw such an inference from this information rather than recognize that other non-biased reasons may support the gender makeup of the sexual misconduct cases at [the university]." 892 F.3d at 92. We also concur in that court's observation that the statistical "data fail to address an array of alternative explanations" for the disparity between the number of males and females charged with sexual assault. Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 75 (1st Cir. 2019); see also Doe v. Univ. of Denver, 952 F.3d at 1193-94.

We turn, then, to the then-governing "Dear Colleague" Letter, which provided guidance on how universities may comply with Title IX's requirements pertaining to sexual harassment and violence. Department of Education, Dear Colleague Letter (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf p. 1. It cited a statistic that one in five women are victims of sexual assault or attempted sexual assault while in college, together with a statistic that 6.1 percent of males were also "victims of completed or attempted sexual assault during college." Id. at 2. It then discussed the relevant enforcement mechanisms in gender-neutral terms, referring to "students," "harassers," "victims," and characterizing complainants as male or female ("his or her" complaint, name, etc.). Id. at 4. The

-18-

letter explicitly stated that Title IX "prohibits gender-based harassment, which may include . . . hostility based on sex or sex-stereotyping." Id. at 3 n.9.[4]

The letter, aptly characterized as the "now-famous 'Dear Colleague' letter . . . 'ushered in a more rigorous approach to campus sexual misconduct allegations' by defining '"sexual harassment" more broadly than in comparable contexts' and requiring that 'schools prioritize the investigation and resolution of harassment claims' and adopt a lower burden of proof when adjudicating claims of sexual misconduct." Menaker, 935 F.3d at 26 (quoting Doe v. Purdue Univ., 928 F.3d at 668); see also, e.g., Doe v. Univ. of the Scis., 961 F.3d at 213-14 (discussing potentially ruinous loss of federal funds that might result from noncompliance with the letter's requirements); Doe v. Univ. of Denver, 952 F.3d at 1192 ("[A]s other plaintiffs have in recent years, Plaintiff sets the stage for his Title IX claim by shining a spotlight on the 2011 Dear Colleague Letter . . . .").

Rossley argues that a reasonable juror could conclude that the letter coerced Drake into pursuing punitive, one-sided investigations of male respondents in sexual misconduct disciplinary cases. He argues that the letter's false statement that one in five women on campus are victims of sexual assault led to the establishment of tribunals and procedures specifically geared to the prosecution of cases of sexual assaults against women. Whatever the validity of Rossley's allegation that the letter's statistics are inaccurate, his argument ignores the letter's data that both men and women have been victims of campus sexual assault, as well as the letter's use of gender-neutral language. We thus do not accept Rossley's argument that, influenced by the "Dear Colleague" letter's *in terrorem* effect, Drake "did not attend to what is required for fairness to male respondents." Appellant's Brief 53. We instead affirm the district court's grant of summary judgment on Rossley's Title IX claim. In so

---

[4]The Department's current stance regarding the "Dear Colleague Letter" is set forth in Doe v. University of Arkansas-Fayetteville, 974 F.3d at 868 n.1.

-19-

holding, we note that the pressure that was being put on Drake to investigate and adjudicate IX complaints by females against males does not appear to have approached that described in Doe v. University of Arkansas-Fayetteville, 974 F.3d at 865, nor was it combined with the clearly irregular investigative and adjudicative processes that were found to support a *prima facie* claim of sex discrimination in Doe v. Columbia University, 831 F.3d at 56-57, and in Menaker, 935 F.3d at 34-37.

Rossley argues that the district court erred in granting summary judgment on his claim that Drake failed to accommodate his ADHD, dyslexia, and word-retrieval issues during the investigation, disciplinary hearing, and appeals hearing. Title III of the ADA "prohibit[s] public accommodations from discriminating against individuals because of their disabilities." PGA Tour, Inc. v. Martin, 532 U.S. 661, 681-82 (2001); see also 42 U.S.C. § 12182(a).

> [I]n the higher education context, a person alleging a failure to accommodate under Title III . . . must show (1) that the plaintiff is disabled and otherwise qualified academically, (2) that the defendant is a private entity that owns, leases or operates a place of public accommodation . . . , and (3) "that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation."

Mershon v. St. Louis Univ., 442 F.3d 1069, 1076 (8th Cir. 2006) (quoting Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999)). Drake does not dispute that Rossley can establish the first two elements of a Title III claim. Rossley, 342 F. Supp. 3d at 936. On the third element, the plaintiff "bears the initial burden of demonstrating that he requested reasonable accommodations." Mershon, 442 F.3d at 1077. Additionally, the plaintiff must "explain how each requested accommodation was necessary to enable him to participate in light of his disabilities." Id. Drake argues that Rossley failed to produce evidence that he—or anyone on his

behalf—adequately requested an accommodation for his disabilities during the disciplinary process.

To accommodate Rossley's dyslexia, ADHD, and word-retrieval difficulties, Drake had previously provided him "time and a half" for exams, as well as other accommodations "var[ying] from class to class" based on his discussions with professors. Rossley alleges that he had made Sirna, McKinney, Foxhoven, and Parker aware of his disabilities. Rossley concedes, however, that neither he nor his representative explicitly requested that he be provided accommodations during the disciplinary process. He instead alleges that legally sufficient requests were made (1) constructively, because Drake was aware of his academic accommodations, which he mentioned during the hearing, and (2) in-fact, when his father asked a university official to accommodate those disabilities.

Rossley relies on Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1382-83 (3d Cir. 1991), and Redding v. Nova Southeastern University, Inc., 165 F. Supp. 3d 1274, 1293-94 (S.D. Fla. 2016), in support of his constructive-notice argument. In Nathanson, the court determined that plaintiff had shown that she had requested a specific kind of chair to accommodate her disability. 926 F.2d at 382. In Redding, the plaintiff made a specific, albeit informal request for accommodation. 165 F. Supp. 3d at 1296. Here, however, Rossley made no specific request, formal or informal, for an accommodation.

Rossley argues that Mershon v. St. Louis University does not foreclose his constructive notice argument. Mershon nonetheless requires a plaintiff to connect a request to the stated disability by explaining "how each requested accommodation was necessary to enable him to participate in light of his disabilities." 442 F.3d at 1077. Rossley's requests for extra time during the disciplinary hearing "were consistently raised as an issue of procedural fairness." Rossley, 342 F. Supp. 3d at 937. Rossley's demand that he "deserved time and a half for anything and everything" or "double anything" did not "explain how each requested

accommodation was necessary to enable him to participate in light of his disabilities." Mershon, 442 F.3d at 1077. Rossley thus failed to connect his demands to his disability, nor did he allege that he could not participate effectively in the disciplinary proceedings without those accommodations.

Rossley argues that his father requested reasonable accommodations during his December 2015 phone call with Dean Parker. Putting aside the question whether third-party requests are cognizable, Rossley's father did not request any specific accommodation and did not explain how an accommodation would enable Rossley to better participate in the hearings. We therefore affirm the district court's ruling that no genuine issue of material fact existed regarding Rossley's need for accommodations.

We have considered Rossley's argument that the district court erred in granting summary judgment on his breach of implied duty of good faith and promissory estoppel claims and conclude that it did not err in ruling as it did.

We affirm the district court's grant of summary judgment in favor of Drake and remand with instructions to dismiss with prejudice the claims that had previously been dismissed without prejudice by stipulation.

_____