# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-1842

_____

John Doe,

*Plaintiff - Appellant,*

v.

University of Arkansas - Fayetteville; Board of Trustees of the University of Arkansas; Tyler R. Farrar, individually and in his official capacity; Jon Comstock, individually and in his official capacity; Eric Specking, individually and in his official capacity; Dina Wood, individually and in her official capacity; Kristin Barnett, individually and in her official capacity,

*Defendants - Appellees.*

------------------------------

Foundation for Individual Rights in Education,

*Amicus on Behalf of Appellant.*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: January 15, 2020
Filed: September 4, 2020

_____

Before COLLOTON, SHEPHERD, and ERICKSON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

John Doe, a former student at the University of Arkansas-Fayetteville, sued the University (through its Board of Trustees) and several university officials, claiming that they violated his rights in a disciplinary action against him. The district court granted the defendants' motion to dismiss. We conclude that the complaint stated a claim under Title IX of the Education Amendments of 1972 that is plausible on its face, but that the other claims were properly dismissed, so we reverse in part, affirm in part, and remand for further proceedings.

I.

John Doe, who proceeds under a pseudonym, was a senior at the University when a female student accused him of sexual assault. The accuser is named under the pseudonym Jane Roe in the lawsuit. The accusation arose from a sexual encounter between the two in the early morning of October 29, 2017. A hearing panel found Doe "responsible" for sexual assault in violation of university policy and imposed sanctions. Because the appeal arises from a motion to dismiss, we must assume the facts as alleged in Doe's complaint.

Roe and Doe knew each other socially, but had no romantic relationship before this incident. On the evening of October 28, Roe contacted Doe by text message while at a party where she had been drinking. The two exchanged several text messages and agreed to meet at Doe's off-campus apartment just after midnight. Roe told Doe she would ride with an Uber driver and meet Doe at his apartment. Roe continued to send Doe texts updating him on her location until she arrived. During the subsequent investigation of the incident, Roe stated that while she was texting

Doe, she was "not drunk," and that she did not consume any alcohol after arriving at Doe's apartment.

At Doe's apartment, the two talked and watched television together in Doe's room. At some point, Roe turned off the lights, sat next to Doe on a bed, and began kissing him. According to the complaint, Roe said several times that she wanted to engage in sexual intercourse. Doe alleges that he asked, "Do you want to have sex?", and that Roe replied, "Yes." The two then engaged in sexual intercourse.

Roe and Doe continued to talk after the encounter. Doe eventually told Roe that he would soon have to leave to pick up friends who needed a ride. He suggested that she accompany him to meet the friends, and that he would then take her back to her apartment. Roe protested and tried to convince Doe to stay at the apartment with her. When she realized that Doe would not stay, she became angry, said that she was "tired of compromising for guys," told Doe that she would never speak to him again if he took her home, and started yelling that she was going to walk home. Doe alleges that his roommate overheard this exchange; the roommate said that Roe was not slurring her words and did not sound intoxicated. Doe eventually took Roe home, despite her protests. Sometime after Roe returned to her residence, she cut her wrists in an apparent suicide attempt.

Roe later filed a complaint with the University's Title IX office. The University's school policies and Code of Student Life set forth the University's standards for acceptable conduct. They also describe the procedures by which the University investigates and adjudicates alleged violations. The policies prohibit "sexual assault" and define it as follows:

> An actual or attempted sexual contact with another person without that person's consent. Sexual assault includes, but is not limited to involvement in any sexual contact when the victim is unable to consent;

intentional and unwelcome touching of, or coercing, forcing, or attempting to coerce or force another to touch a person's intimate parts (defined as genital area, groin, inner thigh, buttocks, or breast); and sexual intercourse without consent. Acts defined as sexual assault include rape, date rape, acquaintance rape, and gang rape, but also may include sexual touching of another person against his or her will, and forcing an unwilling person to touch another person sexually. Sexual assault occurs when such acts are committed either by force, threat, or intimidation, or through the use of the victim's mental or physical helplessness, of which the assailant was aware or should have been aware.

R. Doc. 1, at 13, ¶ 71.

University policy requires the Title IX coordinator to make an initial assessment and then refer complaints to a Title IX investigator. The investigator has a duty to conduct a "comprehensive investigation" into the allegations. The investigator provides a summary of her findings to the coordinator, who then determines based on a preponderance of the evidence whether the conduct constitutes a violation of Title IX.

Either party may appeal the coordinator's decision. On appeal, a three-person hearing panel considers evidence presented by both sides *de novo* and determines whether a violation occurred. The policy specifies that a student accused of violating the policy "shall be presumed not responsible for a violation until determined to be responsible by a preponderance of evidence."

Tyler Farrar, the University's Title IX coordinator, oversaw Roe's complaint. On November 6, 2017, Farrar notified Doe that Roe had filed a complaint against him. The notice stated that Roe "believes sexual contact occurred while she was incapacitated and unable to give consent." Roe said she believed that Doe "had sexual contact with her when she was too intoxicated to give verbal or implied consent."

-4-

Farrar referred the complaint to a Title IX investigator, Kristin Barnett. Roe told Barnett that she "had been drinking earlier in the evening and then met up with John Doe at his residence." She stated that "she did not recall much of the evening at John Doe's house," but did believe that sexual intercourse had occurred. She later told Barnett that she had a "really blurry" memory of having sexual intercourse with Doe. Roe did not allege that Doe used force, threat, or intimidation. A final investigative report was completed in February 2018.

Farrar later received a report from the Fayetteville Police Department. The report included a statement from the Uber driver who drove Roe to Doe's home on the evening of the incident. The driver said that she did not recall that Roe was intoxicated during the ride. The police report allegedly concluded that the University's Title IX investigation "showed several inconsistencies that were not mentioned or were contrary to [Jane Roe]'s original statement" to police.

After reviewing the reports, Farrar issued a decision concluding that the evidence did not show that Doe violated university policy. Farrar concluded that sexual contact occurred between Doe and Roe, but that the evidence was insufficient to establish that it was more likely than not that Roe was intoxicated to the point of incapacitation. Farrar found that Roe's consumption of alcohol had not substantially impacted her decision-making capacity, awareness of consequences, and ability to make fully informed judgments. He cited Roe's "coherent, error-free, and goal-oriented" text messages en route to Doe's residence as evidence that she was "capable of making fully informed judgments regarding her actions." Farrar also found no evidence that Roe drank alcohol at Doe's residence or that she consumed a significant amount of alcohol just before getting into the Uber.

In light of the facts, the complaint avers, Farrar found no evidence that Roe was incapacitated while at Doe's residence. Farrar also concluded that Doe had no reason to know of Roe's alleged incapacitation, because Roe's text messages "would have

led a reasonable person to the conclusion that [Roe] had the ability to understand the 'who, what, when, where, and how' of her actions."

Roe appealed Farrar's decision. Roe challenged Farrar's finding that she was not incapacitated. She also argued that Farrar's decision assumed that she consented to sexual contact with Doe and lacked analysis of whether she had in fact consented. Roe further stated: "It is to my understanding that the University defines sexual assault allegation within two categories: by force and through incapacitation. I do not believe these terms are mutually exclusive. I have stated this previously. If an individual is incapacitated while someone performs sexual acts to them, those acts are subsequently 'by force' without question."

Before the hearing, Doe requested clarification on the scope of the charges against him. He noted that although Barnett had confirmed that the University was not pursuing an allegation that he used force against the complainant, Roe's statements on appeal were "confusing" on this issue, and it was "unclear whether the allegation is force or not." Farrar responded that Doe would not know the full extent of what charges the University would or would not pursue until he arrived at the hearing.

The hearing panel—composed of Jon Comstock, Eric Specking, and Dina Wood—conducted a hearing on Roe's appeal on April 23, 2018. The panel then found that "at some undetermined point in time, while [Roe] was at [Doe's] residence, she became incapacitated as defined by University policy." But the panel did not find that Doe "knew or had reason to know of the period of time during which [Roe] was or became incapacitated."

The panel nevertheless found by a vote of two to one that it was more likely than not that Doe violated the policy on sexual assault. According to the complaint, the panel credited Roe's statement that she did not recall whether she had consented,

but that "she did not know why she would have." The panel disregarded Doe's testimony that the sexual contact was consensual on four bases: (1) Doe "did not admit or acknowledge [Roe's] level of intoxication upon arrival at [his] residence," (2) Doe "had motivation to skew the truth," (3) Doe's demeanor "lacked credibility," and (4) Doe's witness statements were "internally inconsistent or irrelevant on the subject of consent."

The panel ultimately concluded as follows: "Because the record does not support a finding of consent by the Complainant, the Panel finds that you are 'responsible' for sexual assault in violation of Policy 418.1." As sanctions, the panel required Doe to complete Title IX training, ten hours of community service, and an online sexual violence accountability course. Doe was allowed to graduate from the University.

Doe alleges that while the disciplinary action proceeded, the University faced several investigations regarding its past handling of sexual assault allegations made by female students against male students. He asserts that media outlets and student organizations had reported that the University was not "adequately resolving cases involving alleged sexual assault of female students against male students." The Office for Civil Rights of the United States Department of Education was investigating the University's previous Title IX complaints to determine whether the University had "a pattern and practice of improperly investigating Title IX cases." The Arkansas legislature began an investigation into claims that the University was failing properly to investigate and adjudicate claims of sexual assault by females against males on the Fayetteville campus. A female athlete at the school filed a "highly publicized" lawsuit alleging that the University failed properly to adjudicate her complaint of sexual assault against a male athlete. These events resulted in "numerous news articles" criticizing the University's handling of sexual assault claims by females.

After the initial decision by the Title IX coordinator finding no misconduct, Roe herself publicly criticized the University's decision. She spoke with multiple media outlets and started a campus-wide protest of the Title IX office. The University ultimately issued a public statement in response to Roe's "media blitz."

Doe alleges that the University was under pressure and fearful of sanctions from the Office for Civil Rights, so it took steps harmful to Doe to alleviate and lessen the scrutiny that it was attracting from Roe's media blitz and protests. He also asserts that the University was afraid of a lawsuit from Roe. Doe further alleges that a fear of losing state and federal funding due to investigations, the threat of pending lawsuits, and the overall scrutiny by the media and student body motivated the hearing panel to decide against him because he was a male.

Doe sued the University and several officials—Barnett, Farrar, and the three hearing panel members—alleging violations of his rights under the Due Process Clause and Title IX. The district court granted the defendants' motion to dismiss on all counts after determining that the complaint failed to state a claim. We review the district court's grant of a motion to dismiss *de novo*. *Soueidan v. St. Louis Univ.*, 926 F.3d 1029, 1034 (8th Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

II.

We first address Doe's claim against the University under Title IX. Federal courts are not a forum for general appellate review of university disciplinary proceedings. But Title IX places a specific limitation on the authority of educational institutions that receive federal funds: "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). To state a claim, therefore, Doe must allege adequately that the University disciplined him on the basis of sex—that is, because he is a male. *See Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019).

Doe points to a number of alleged facts that he says support an inference that the University discriminated against him on the basis of sex. We conclude that several circumstances taken together are sufficient to state a claim to relief that is plausible on its face.

First, the allegations in the complaint support an inference that the hearing panel reached an outcome that was against the substantial weight of the evidence. The panel found that Roe became incapacitated while at Doe's residence and credited Roe's testimony that she did not remember whether she consented, but did not know why she would have. The panel then found Doe responsible for sexual assault because Roe did not consent. According to the complaint, therefore, the panel's finding against Doe was tied to its conclusion that Roe was incapacitated.

The panel's finding that Roe became incapacitated at Doe's residence, however, is against the substantial weight of the evidence set forth in the complaint. Farrar, the Title IX coordinator, allegedly found that Roe's consumption of alcohol "had not substantially impacted her decision-making capacity, awareness of consequences, and ability to make fully informed judgments." He noted her "clear ability to communicate with John Doe via text message and coordinate her efforts to leave the party so that she arrived at his residence shortly after he arrived." He observed that Roe was "cognizant of her physical location" while traveling to Doe's residence "and even narrated her location to John Doe through text messages by stating 'turning on gregg' and using the correct spelling with two 'g's." Farrar also found no evidence to suggest that Roe drank alcohol at Doe's residence or that she

consumed a significant amount of alcohol just prior to getting into the Uber. The complaint does not recount any findings of the hearing panel about alcohol use that would supersede those made by Farrar. Based on the present record, therefore, the panel's finding about Roe's incapacitation is unexplained and against the substantial weight of the evidence as detailed in the complaint.

Second, the panel's chosen sanctions are allegedly contrary to the ordinary disposition in cases of sexual assault by force. Doe asserts that the panel accepted Roe's contention on appeal that he committed sexual assault by force by engaging in sexual contact while she was incapacitated. Whereas the complaint says that a student found responsible for sexual assault by force typically has been expelled, the University allowed Doe to graduate and required only Title IX training, community service, and an online course. The panel allegedly explained that the lesser sanctions were selected due to the "extremely close factual determinations that were very difficult to make." But Doe asserts that the deviation from ordinary sanctions suggests that the University found him responsible for sexual assault in order to avoid further negative media attention and to portray a stricter approach to sexual assault cases.

Third, Doe alleged that the University was under pressure on multiple fronts to find males responsible for sexual assault. The Office for Civil Rights was conducting an investigation into whether the University failed properly to investigate and adjudicate Title IX complaints by females against males. The Arkansas legislature had launched an investigation of the University on the same subject. The University was facing a "highly-publicized" lawsuit from a female student athlete for its alleged mishandling of her Title IX complaint against a male student athlete. According to Doe, these inquiries had resulted in substantial criticism of the University in the press and on campus. On top of that, Doe alleges, Roe personally orchestrated a campus-wide protest after the Title IX coordinator found that Doe was not responsible for sexual assault against her. Roe's actions brought significant

-10-

media attention to the University's handling of the incident, and prompted a public statement by the University.

These circumstances, taken together, are sufficient to support a plausible claim that the University discriminated against Doe on the basis of sex. A decision that is against the substantial weight of the evidence and inconsistent with ordinary practice on sanctions may give rise to an inference of bias, although not necessarily bias based on sex. *See Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018); *Doe v. Miami Univ.*, 882 F.3d 579, 592-93 (6th Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016); *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not necessarily in a particular case. *See Doe v. Purdue Univ.*, 928 F.3d at 668-69; *Baum*, 903 F.3d at 586. Doe's complaint alleges both: a dubious decision in his particular case taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants. The allegations are sufficient to state a claim under Title IX that is plausible on its face.

Our conclusion is limited to resolving the motion to dismiss. The present record includes only Doe's version of events as set forth in his complaint. The University has not responded at this stage to Doe's factual allegations, and the record does not even include the hearing panel's complete decision. We decide only that the case may proceed to discovery and further factual development on this claim.

III.

We next address Doe's due process claims against the University officials in their official capacities. An official-capacity claim is a claim against the institution, *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998), so Doe's allegation here is that the University denied him due process of law in the disciplinary process. He seeks

injunctive relief, including rescission and expungement of the panel's decision. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002).

The Due Process Clause forbids a State to deprive a person of life, liberty, or property without due process of law. The district court, citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971), assumed that Doe had a liberty interest in avoiding the disciplinary decision because it impugned his good name, reputation, and honor. *See generally Gunderson v. Hvass*, 339 F.3d 639, 644 (8th Cir. 2003). Doe argues on appeal that he has a liberty interest, because the University adjudicated him guilty of sexual assault, and his disciplinary record will interfere with his ability to pursue graduate studies. He also asserts a property interest in avoiding payment for Title IX training ordered by the hearing panel. The University does not dispute this point, and we likewise assume that the panel decision implicates a protected liberty or property interest of Doe. *See Doe v. Purdue Univ.*, 928 F.3d at 662; *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).

To determine whether the University's procedures are constitutionally adequate we must consider the relevant governmental and private interests. These include the private interests affected by official action, the risk of an erroneous deprivation through the procedures used, the probable value of additional or substitute procedural safeguards, and the government's interest, including the burdens that additional safeguards would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Doe's first procedural complaint is that the University failed to provide him with adequate notice of the charge against him. In a disciplinary action by a state university, "procedural due process must be afforded . . . by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case." *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969). Doe asserts that the panel found him responsible for sexual assault based on a theory about which he did not receive adequate notice.

-12-

According to the complaint, the University first notified Doe that Roe had alleged sexual contact that occurred "while she was incapacitated and unable to give consent." The Title IX coordinator's initial decision rejected Roe's allegation, finding insufficient evidence that Roe was intoxicated to the point of incapacitation or that Doe had reason to know of any alleged incapacitation. On appeal, however, the panel found that Doe committed sexual assault because Roe did not consent to sexual contact.

Doe contends that he did not receive notice that the hearing panel would consider a charge that he committed sexual assault by force or without consent. The complaint acknowledges, however, that Roe advanced these arguments in her appeal of the Title IX coordinator's initial decision. She challenged the finding that she was not incapacitated; she argued that the decision assumed that she consented and lacked any analysis about whether she had actually consented; and she argued that when a student performs sexual acts on an incapacitated person, the acts are committed "by force." R. Doc. 1, at 21.

Doe's complaint acknowledges that the panel found him responsible based on the arguments that Roe raised in her appeal. Although he characterizes the panel's decision as "*sua sponte*," Doe admits that the panel adjudicated "Roe's new allegation of forceful sexual assault," *id*. ¶ 234, and admits that the panel found him responsible for committing sexual assault by force. *Id*. ¶¶ 152, 244. Given that Roe's appeal expressly raised the issues of consent and sexual assault by force, Doe received reasonable notice that the hearing panel may consider those allegations. Notice need not come directly from the adjudicators if the accused is alerted to the allegations by the party who raised the complaint about his conduct. *See Navato v. Sletten*, 560 F.2d 340, 346 (8th Cir. 1977).

Doe next argues that the hearing panel improperly placed the burden of proof on him as the accused. The University's Code of Student Life states that a student

-13-

"shall be presumed not responsible for a violation until determined to be responsible by a preponderance of evidence." Doe contends that the panel shifted the burden by holding him "responsible" on the ground that "the record does not support a finding of consent by the Complainant."

Assuming for the sake of analysis that placing a burden of persuasion on Doe would raise a constitutional concern, *cf. Lavine v. Milne*, 424 U.S. 577, 585 (1976), we agree with the district court that the complaint does not state a claim on this point. The panel proceeded on the view that the University could establish a violation of policy by showing that Doe caused sexual contact without consent by Roe. The parties agreed that there was sexual contact. Roe, claiming incapacitation, testified that she did not remember whether she consented, but did not see why she would have done so. The panel credited that testimony, which was evidence that Roe did not consent. The panel did not believe Doe's testimony that Roe expressly consented. Doe complains that the panel did not require the University to show "lack of consent," but the panel found that "the record on the part of the Complainant was absent of any evidence of consent," and then credited her testimony. Based on the explanation of the panel's ruling set forth in the complaint, we understand the credibility determinations to mean that the panel believed that Roe did not consent. Based on that finding, the University overcame the presumption of non-responsibility.

Doe also alleges that the University violated his due process rights by not allowing him or his agent personally to cross-examine witnesses. The University's procedure required Doe to submit questions to the hearing panel and allowed the panel discretion about whether to pose the questions to witnesses.

A process under which the adjudicating panel poses questions to witnesses is not "so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation." *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019); *see also Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987)

-14-

("Although an important notion in our concept of justice is the cross-examination of witnesses, there was no denial of appellants' constitutional rights to due process by their inability to question the adverse witnesses in the usual, adversarial manner."); *cf. Baum*, 903 F.3d at 581 (holding that a university "must facilitate some form of cross-examination in order to satisfy due process"). While adversarial cross-examination, when employed by a skilled practitioner, can be an effective tool for discovering the truth, *see California v. Green*, 399 U.S. 149, 158 (1970), there are legitimate governmental interests in avoiding unfocused questioning and displays of acrimony by persons who are untrained in the practice of examining witnesses. There also would be costs and burdens associated with imposing on a university all of the formal procedural requirements of a common law criminal trial. *See Gorman v. Univ. of R.I.*, 837 F.2d 7, 16 (1st Cir. 1988); *cf. Goss v. Lopez*, 419 U.S. 565, 583 (1975).

Questioning by the panel could be insufficient in a given case, but Doe does not identify any material flaw in this proceeding. He alleges that the panel left out "important points" from his proposed questions and did not ask "pertinent follow up questions," but he identifies no specific question that was refused. Conclusory allegations are insufficient. *Iqbal*, 556 U.S. at 680-81. Without a stronger allegation that the panel failed to pursue particular inquiries that were material to the truth-finding process, Doe has failed to state a claim.

Doe next asserts that the standard of proof employed by the University—a preponderance of the evidence—deprived him of due process. While there is a substantial legal and policy debate about whether a more demanding standard is appropriate, *see Lee v. Univ. of N.M.*, No. CIV 17-1230 JB/LF, 2020 WL 1515381, at *36-38 (D.N.M. Mar. 30, 2020) (collecting literature), we do not think a higher standard of proof is compelled by the Constitution. The preponderance standard "is commonly used in civil proceedings, even to decide matters of great importance." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016). As the district court observed, a civil action for sexual battery is governed by a preponderance

standard, despite the potential for damages and similar consequences for an accused's reputation. *See* Ark. Model Instrs. Civ. 202, 418 (2018). Doe cites no authority holding that due process requires a higher standard of proof in university disciplinary proceedings or comparable civil actions. A heightened burden of proof may lessen the risk of erroneous deprivations for an accused, but it also could frustrate legitimate governmental interests by increasing the chance that a true victim of sexual assault is unable to secure redress and a sexual predator is permitted to remain on campus. We conclude that the choice between the competing standards of proof is within the range of options available to a public university under the Constitution.[1]

Doe objects to the hearing panel's application of *de novo* review, but we see no plausible allegation of a constitutional violation. The appellate proceeding may be duplicative, but there is no inherent reason why a panel's *de novo* decision is more likely to lead to an erroneous deprivation than deferential appellate review. *Cf.* 28 U.S.C. § 636(b)(1). It so happens that Doe received a favorable ruling from the Title IX coordinator that was reversed by the hearing panel, but as a matter of procedure, it could just as well have happened the other way around.

Doe also maintains that the University was required to attempt to interview two witnesses whom he identified. But Doe admits that he does not know what the proposed witnesses—Roe's mother and ex-boyfriend—would say about the incident.

---

[1]In 2011, the Department of Education notified institutions that for grievance procedures to be consistent with Title IX standards, they must employ a preponderance of the evidence standard. U.S. Dep't of Educ., Off. for C.R., *Dear Colleague Letter*, at 10 (Apr. 4, 2011). In 2017, however, the Department withdrew the guidance after observing that it was issued without notice and comment and had been the subject of criticism by legal commentators. U.S. Dep't of Educ., Off. for C.R., *Dear Colleague Letter*, at 1 (Sept. 22, 2017). Effective August 14, 2020, the Department implemented a regulation under which a university must apply either a preponderance of the evidence standard or a clear and convincing evidence standard. *See* 34 C.F.R. § 106.45(b)(1)(vii).

Appellant's Br. 46. Due process does not require fishing expeditions that could burden officials with immaterial investigative work. Without a concrete reason to believe that the proposed witnesses have material information, Doe has not pleaded adequately that the University's evidence-gathering in this case impermissibly increased the risk of erroneous deprivation or violated his due process rights.

Doe's claim that the University failed to train officials also fails on the pleading. Without a sufficient allegation of an underlying constitutional violation by university officials, Doe cannot state a claim against the institution for unconstitutional failure to train. *See Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012).

Because we determine that Doe has not stated a claim under the Due Process Clause against the officials in their official capacities, it follows that the parallel due process claims against the officials in their individual capacities were properly dismissed.

\* \* \*

For these reasons, we conclude that Doe has stated a facially plausible claim against the University under Title IX, but failed to state a claim against the defendants under § 1983 based on the Due Process Clause. The judgment is reversed on the Title IX claim and is otherwise affirmed. The case is remanded for further proceedings.

_____