# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-3340
_____

John Doe

*Plaintiff - Appellant*

v.

University of Iowa; Board of Regents, State of Iowa; Tiffani Stevenson Earl, individually and in official capacity; Iris Frost, individually and in official capacity; Lyn Redington, individually and in official capacity; Angie Reams, individually and in official capacity; Constance Schriver Cervantes, individually and in official capacity; John Keller, individually and in official capacity; Monique DiCarlo, individually and in official capacity; Mark Braun, individually and in official capacity

*Defendants - Appellees*

------------------------------

Stop Abusive and Violent Environments

*Amicus on Behalf of Appellant(s)*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: October 19, 2022
Filed: September 14, 2023
_____

Before KELLY, WOLLMAN, and KOBES, Circuit Judges.
_____

KELLY, Circuit Judge.

The University of Iowa expelled graduate student John Doe after investigating two accusations of sexual misconduct brought against him by different complainants. The Iowa Board of Regents affirmed the decision. Doe sued the University and University officials, claiming, in part, discrimination on the basis of sex under Title IX, 20 U.S.C. § 1681(a), and procedural due process violations, 42 U.S.C. § 1983. The district court[1] granted qualified immunity to the University officials, dismissed the procedural due process claims against them, and granted the University summary judgment on the remaining claims. Doe appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

John Doe, who proceeds under pseudonym, was a graduate student at the University of Iowa when he was accused of sexual assault and sexual harassment by Complainant 1 and Complainant 2, both of whom were female undergraduate students at the University at the time. Doe met the Complainants in the Sociology Undergraduate Research Group (SURG) Lab, which was supervised by Professor Michael Lovaglia, Doe's mentor. Doe was the only graduate student in the SURG Lab. Complainant 1, Complainant 2, and Lovaglia testified that Doe had an informal managerial role in the Lab, although Doe disclaimed the title "lab manager."

In October 2016, Complainant 1 told Lovaglia that she and Doe had engaged in sexual activity and that she had asked Doe "to not pursue her anymore." Lovaglia met with Doe to discuss Doe's professionalism and conduct in the SURG Lab.

In February 2017, Complainant 1 told Lovaglia of Doe's repeated inappropriate conduct. She further said that in September 2016 Doe had touched her

---

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

breast and kissed her without her consent. Lovaglia reported the complaints to Monique DiCarlo, the University's Sexual Misconduct Response Coordinator and Title IX Coordinator, and the University began its investigation that same month.

Another complaint against Doe was also filed in February 2017. Complainant 2 reported that Doe had brought alcohol into the SURG Lab and touched her breast without her consent. Doe received a Notice of Complaint and Investigation and Interim Sanctions for each complaint from Lyn Redington, the University's Assistant Vice President and Dean of Students. Tiffini Stevenson Earle, a compliance specialist in the University's Office of Equal Opportunity and Diversity, investigated the allegations and found sufficient evidence to charge Doe with violating University policies. In written reports, Stevenson Earle recommended a formal hearing on the charges.

Constance Schriver Cervantes, compliance coordinator in the University's Office of Equal Opportunity and Diversity, issued Doe a Notice of Formal Hearing, listing the specific charges and policy violations. Iris Frost, a University professor of rhetoric and former prosecutor, was appointed adjudicator of Doe's hearing. Frost found Doe responsible for sexual assault and sexual harassment and filed a written Decision. Redington issued a Notice of Sanctions, informing Doe of his immediate expulsion. Doe appealed, and John Keller, the University's Associate Provost of Graduate Education, upheld the decision. Doe appealed again to the Iowa Board of Regents, which affirmed the University's decision.

Doe sued the University and its officials, alleging, in part, discrimination on the basis of sex under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and procedural due process violations, 42 U.S.C. § 1983. The district court found the University officials entitled to qualified immunity and dismissed the procedural due process claims against them. The district court also granted summary judgment to the University on the Title IX claim and the remaining procedural due process claim. Doe appeals.

We review all of Doe's claims on appeal de novo. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2005) (en banc) (standard of review for a grant of summary judgment); Scott v. Baldwin, 720 F.3d 1034, 1036 (8th Cir. 2013) (standard of review for the grant of a motion to dismiss on qualified immunity). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Torgerson, 643 F.3d at 1042 (quoting Fed. R. Civ. P. 56(c)(2)). The nonmovant "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Torgerson, 643 F.3d at 1042 (quoting Ricci v. DeStefano, 557 U.S. 557, 586 (2009)).

II.

Doe appeals the grant of summary judgment on his Title IX claim. "Title IX provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" Does 1-2 v. Regents of the Univ. of Minn., 999 F.3d 571, 577 (8th Cir. 2021) (alteration in original) (quoting 20 U.S.C. § 1681(a)); Rossley v. Drake Univ., 979 F.3d 1184, 1191 (8th Cir. 2020) ("Title IX prohibits federally funded universities from discriminating against students on the basis of sex." (citing 20 U.S.C. § 1681(a))). "Title IX is 'understood to bar[] the imposition of university discipline where [sex] is a motivating factor in the decision to discipline.'" Rowles v. Curators of the Univ. of Mo., 983 F.3d 345, 359 (8th Cir. 2020) (alteration in original) (quoting Doe v. Columbia Univ., 831 F.3d 46, 52 (2d Cir. 2016)).

To survive summary judgment on his Title IX claim, Doe had to present sufficient evidence to allow a reasonable jury to find that the University disciplined

-4-

him on the basis of sex. See Rossley, 979 F.3d at 1192 (first citing Doe v. Purdue Univ., 928 F.3d 652, 667 (7th Cir. 2019); and then citing Doe v. Univ. of Ark.-Fayetteville, 974 F.3d 858, 864 (8th Cir. 2020)); see also Univ. of Ark.-Fayetteville, 974 F.3d at 864 (clarifying the pleading standard for Title IX claims: a plaintiff "must allege adequately that the University disciplined him on the basis of sex—that is, because he is a male"). Doe argues that he has raised a genuine factual dispute as to whether the University disciplined him because he is a male based on evidence that (1) the adjudicator reached a decision that was against the substantial weight of the evidence; (2) decisionmakers exhibited express anti-male bias; and (3) the University was under outside pressure to bring disciplinary proceedings against him as a male accused of sexual misconduct.

A.

First, Doe argues that we should infer bias in the University's decision because it was rendered against the substantial weight of the evidence.[2] Doe asserts that Frost omitted material information from her Decision: Lovaglia's testimony that he understood the "sexual behavior" between Doe and Complainant 1 was consensual. But Doe highlights only a limited portion of the relevant testimony. At the hearing, Lovaglia interrupted the questioning "to clarify" that it was his "recollection" that Complainant 1 "conveyed the idea that all of [the] sexual behavior was consensual." But, he continued, he "[a]bsolutely" considered the possibility that the real reason Complainant 1 "did not want to make a complaint against [Doe]" was that she "didn't want to cause any trouble." And Lovaglia was not confident of his own recollection, stating "[he] really hoped [he] did not misunderstand [Complainant 1]." Frost did not find the totality of Lovaglia's

---

[2]Doe makes a passing reference to "procedural irregularities," but he addresses only the weight of the evidence. We address his procedural concerns in Section IV.

observations helpful,[3] and Doe fails to explain how this equivocal testimony is "exculpatory."

Doe also asserts that evidence he considers material was omitted as early in the proceedings as Stevenson Earle's initial reports. But Stevenson Earle's investigation spanned three months, culminating in two reports, each over twenty pages, in which she summarized the interviews she conducted and the evidence she gathered. Doe has not explained how Stevenson Earle's choices in winnowing the collected information into usable reports resulted in a decision against the substantial weight of the evidence. Stevenson Earle's reports did not omit material information establishing that either Complainant consented to the sexual conduct with Doe. And nothing in the record suggests that any of the omissions Doe identifies affected the written Decision. Frost explained that she reads investigative reports before a hearing but does not view them as "any kind of guidance" in resolving a case.

Doe also contends that Keller's summary affirmance reflects an inadequate review of the record on appeal. But the form of Keller's November 30, 2017, letter to Doe conformed to the University's policies, concluding that the adjudicator's decision was "based on substantial evidence . . . not arbitrary, capricious, unreasonable, or an abuse of discretion . . . not unreasonable [sic] harsh in light of the circumstances" and "all procedures were properly followed and did not result in any prejudice towards [Doe]." Doe does not challenge the University's policy that required nothing more.

Finally, Doe argues that, because the Complainants gave conflicting testimony and had ulterior motives for lodging their allegations against him, they were not credible witnesses. Unfounded credibility determinations may indicate a decision rendered against the substantial weight of the evidence. See Doe v. Baum, 903 F.3d 575, 585-86 (6th Cir. 2018). Here, however, Frost based her decision on a

---

[3]Doe also does not mention Lovaglia's testimony that "[Doe] had offered [Complainant 1] a wine, which she said she was not particularly interested in drinking, but that he encouraged her to drink, and so she had some."

thorough review of the testimony and evidence presented at the hearing, where Doe was represented by counsel. Cf. Purdue Univ., 928 F.3d at 663-64 (circumstances in which committee members admitted they did not read the investigative report and did not speak to or receive a statement from the accuser "suggest[ed] that [the Committee] decided that [Doe] was guilty based on the accusation rather than the evidence"). Doe disagrees with the adjudicator's fact finding and her credibility determinations, but this alone does not support the conclusion that the University's decision is against the substantial weight of the evidence.

## B.

Next, Doe argues that he has presented direct evidence of sex bias. In Doe's view, Frost relied on a sex-based stereotype when she asked Complainant 2 at the hearing whether she feared Doe would physically harm her. But as Frost later explained, "[T]he rules do make reference to a concern for physical safety. . . . I wanted to be certain that there was no physical concern on [Complainant 2's] part, and that's why I probed that, not to suggest that there was but to be certain that nobody was acting out of fear or acting out of concern for their physical safety." Doe also objects to Frost's finding that his version of an encounter with Complainant 2—which had occurred "within a couple of hours of their first conversation"—was not credible, saying it "sounded like fantasy, not reality." Doe notes that in a subsequent case, Frost described the testimony of an accused male as a "young man's fantasy," which resulted in an investigation by the University's Office for Civil Rights. Here, Frost testified that Doe's "retelling of the story" to include a "wild" and "passionate intimate encounter" "just didn't seem credible to [her]." The word "fantasy" may have more than one connotation, but we are unable to infer sex discrimination from its single use in a lengthy decision that included exhaustive credibility determinations.

Doe also asserts that Keller exhibited sex bias at the appellate level. In assessing whether the sexual conduct between Doe and Complainant 1 was consensual, Keller said he considered the age disparity and the "power differential"

-7-

between an undergraduate and a graduate student like Doe, who was viewed as a "leader and manager of the activities" in the SURG lab. He also said that Complainant 1's sex was relevant, observing that younger students, particularly young women, often have less experience with intimate relationships than they would if they were older. In addition, Keller had been reviewing Title IX appeals for fifteen years, and every sexual assault case he had reviewed involved a female alleging a sexual assault by a male. He simply had no opportunity to evaluate consent when the accuser was a male. Keller's answers, placed in context, are not sufficient to warrant an inference that the University disciplined Doe because he was a male.

Doe also claims that Keller relied on an "outdated view" of consent when affirming the University's decision. Keller testified how consent—and manifestations of it—can be nuanced when a younger, inexperienced subordinate is caught off-guard by sexual advances from someone in a position of authority like Doe. Keller also understood he was bound by the University's policies, including its definition of consent. And that definition states that "[i]t is the responsibility of the person who wants to engage in the sexual activity to ensure that consent is obtained from the other person," and that "[l]ack of protest or resistance does not mean consent, nor does silence mean consent." Contrary to Doe's assertion, Keller's testimony about consent was sex-neutral and in line with the University's policies.

C.

Finally, Doe argues that evidence of external pressure on the University supports an inference of bias against male students accused of sexual misconduct. Doe identifies five lawsuits that were in the news during the pendency of his case, and he asserts the media coverage was critical of how the University handled the conflicts. However, three of these were gender-based employment discrimination—not sexual misconduct—lawsuits brought by former employees of the University or Board of Regents. The remaining two involved Title IX sexual assault complaints, but Doe simply points to the fact of the lawsuits themselves, without explaining how

the lawsuits, or the attention given to them, amounted to "outside pressure" on the University.[4]

Doe also alleges that DiCarlo's involvement in the proceedings reflected the type of external pressure the University faced to investigate claims of sexual assaults perpetrated by males. Because DiCarlo was the Title IX Coordinator, Doe contends that she "functioned as an initial advocate for complainants." However, nothing in the record supports the idea that DiCarlo was an advocate only for those who accused males of sexual assault. Doe also argues that DiCarlo's email communication with Stevenson Earle about a draft investigative report suggests improper interference. But he does not contend that this type of communication violated University policy. Nor does he explain how DiCarlo's input reflected bias against Doe because he is a male.

Finally, Doe points to DiCarlo's comments at a faculty senate meeting about a "multi-disciplinary effort to address prevention, training, and intervention," which included "expanding programming on healthy masculinity." DiCarlo later explained that the programming was part of an antiviolence plan based on a public health model from the CDC. And she said that the University's goal was to question "the social construct of gender" and students' rigid beliefs and attitudes about "gender role expectations," and to approach men as "allies" in the effort to prevent sexual

---

[4]Compare Univ. of Ark.-Fayetteville, 974 F.3d at 865 (finding external pressure where the Office for Civil Rights and state legislature were investigating the university for failing "properly to investigate and adjudicate Title IX complaints by females against males"; the University was facing a "highly-publicized" lawsuit for mishandling the Title IX complaint of a female student athlete against a male student athlete; and the complainant "orchestrated a campus-wide protest" against the university for not finding Doe responsible for sexual assault, prompting a public statement by the university) with Doe v. Stonehill Coll., Inc., 55 F.4th 302, 335-37 (1st Cir. 2022) (affirming dismissal on the pleadings because external pressure was "too weak to create a plausible inference" of sex bias where Doe was disciplined during the #MeToo movement at the same time as complaints of the college's mishandling of sexual misconduct allegations were pending before the Office for Civil Rights, generating two news articles related to investigations of the college).

misconduct. According to DiCarlo, this programmatic framework "assumes that all of us can have a role" in preventing sexual violence. And it instructs against making assumptions about "who is always a victim or who could be a victim" because, DiCarlo noted, a woman or "a man," or "someone in the LGBT community," all could be complainants.

We are not convinced that institutional efforts to prevent sexual misconduct on campus, including educational programs that challenge students to evaluate the impact of gender norms on rape culture, amount to evidence of external pressure on the University that supports an inference of bias. See Rossley, 979 F.3d at 1194-95 ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." (quoting Sahm v. Miami Univ., 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015))). On this record, Doe has failed to show that the University faced pressure "to find males responsible for sexual assaults" to an extent that would permit the inference that the University discriminated against him because he is male. See also Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 606-07 (S.D. Ohio 2016) (finding no sex discrimination claim when, "at worst," the facts alleged showed "[the university's] actions were biased in favor of alleged victims of sexual assault and against students accused of sexual assault," since "sexual assault victims can be either male or female" (internal citation omitted)).

In sum, Doe has failed to provide "sufficient evidence to allow a reasonable jury to find that [the University] disciplined him on the basis of sex." Rossley, 979 F.3d at 1192 (citations omitted). We affirm the district court's grant of summary judgment on Doe's Title IX claim.

### III.

Next, Doe argues that the district court erred by granting qualified immunity to the University officials on his procedural due process claims. "Our qualified-immunity inquiry involv[es] two questions—whether the official's conduct violated

a constitutional or statutory right, and whether that right was clearly established." Hovick v. Patterson, 37 F.4th 511, 516 (8th Cir. 2022) (citation omitted). We may address either question first. Id.

Doe argues that Frost and Cervantes violated his constitutional right to due process by not giving him adequate notice of the charges against him. See Univ. of Ark.-Fayetteville, 974 F.3d at 866 ("The Due Process Clause forbids a State to deprive a person of life, liberty, or property without due process of law."); Monroe v. Ark. State Univ., 495 F.3d 591, 594 (8th Cir. 2007) ("[W]e assume without deciding that [Doe's] interest in pursuing his education constitutes a constitutionally protected interest." (citing Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 222-23 (1985))). Specifically, Doe asserts that Frost found him responsible for a charge of "'educational leadership role,' despite the investigation concluding that he had no such role in the [SURG] Lab," and that Cervantes failed to give him notice that he could be held responsible for the "educational mission" of the Complainants.

Doe was not "charged" with an "educational leadership role" or with responsibility for the "educational mission" of the Complainants. Cervantes sent Doe a Notice of Formal Hearing, dated August 21, 2017, which told him he was facing four charges: two violations of the Sexual Misconduct Policy and two alcohol-related violations.[5] Frost also recited these four charges at the start of the

---

[5]The charged violations read:

Violation 1: I will charge that you violated Rule 2.2 of the Sexual Misconduct Policy, as defined by section 2.3 of the policy, and Rule 13 of the Code of Student Life with regard to [Complainant 1], a University of Iowa student, during the fall 2016 and spring 2017 semesters, for engaging in sexual activity/contact with [Complainant 1] without obtaining her consent, and for sexually harassing her. Section 2.2 of the policy prohibits "sexual misconduct . . . including sexual assault or sexual harassment, and any form of nonconsensual sexual conduct." Rule 13 of the Code of Student Life requires that students observe the conduct rules in the Sexual Misconduct Policy.

Violation 2: I will charge [alcohol-related violation].

-11-

hearing, and Doe's counsel responded that he and his client "underst[oo]d the charges" and had no questions.

Nor was Doe formally found responsible for an "educational leadership role" or the "educational mission" of Complainants. Instead, Frost made factual findings relevant to the charges, including that Doe was the SURG lab's leader, that undergraduate students viewed him as an authority figure, and that the Complainants felt uncomfortable in the lab because of Doe's "sexual comments and sexual innuendo that masquerade[d] as friendly chatter" and his uninvited, intimate physical contact. The Complainants testified they experienced stress, discomfort, and a desire to avoid the SURG Lab as a result. Frost concluded that Doe's behavior, over time, had "a detrimental effect on their educational experiences, stymied their educational performances, and curtailed their educational opportunities in the SURG program." Frost relied in part on these facts to find Doe responsible for sexual misconduct. Doe's argument to the contrary conflates the violations with the facts supporting them.

The University provided adequate notice of the charges. Because Doe fails to show the University officials' conduct violated his federal rights,[6] we affirm the

---

Violation 3: I will charge that you violated Rule 2.2 of the Sexual Misconduct Policy, as defined by section 2.3 of the policy, and Rule 13 of the Code of Student Life with regard to [Complainant 2], a University of Iowa student, during the fall 2016 and spring 2017 semesters, for engaging in sexual activity/contact with [Complainant 2] without obtaining her consent, and for sexually harassing her. Section 2.2 of the policy prohibits "sexual misconduct . . . including sexual assault or sexual harassment, and any form of nonconsensual sexual conduct." Rule 13 of the Code of Student Life requires that students observe the conduct rules in the Sexual Misconduct Policy.

Violation 4: I will charge [second alcohol-related violation].

[6]Doe also alleges that "Cervantes entered new evidence towards the end of the hearing, even though [University] policies state that Doe should be provided any

district court's dismissal of Doe's claims against the University officials. See Hall v. Ramsey Cty., 801 F.3d 912, 917 (8th Cir. 2015) ("If either question is answered in the negative, the public official is entitled to qualified immunity.") (quoting Vaughn v. Ruoff, 253 F.3d 1124, 1128 (8th Cir. 2001)).

## IV.

Finally, Doe argues the district court erred in granting summary judgment on his remaining procedural due process claim against the University. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). Doe asserts that he received a "fundamentally unfair" hearing because Frost failed to ask all of the questions he proposed for the witnesses.[7]

"Students accused of sexual misconduct are not 'entitled to a hearing of one's own design.'" Regents of the Univ. of Minn., 999 F.3d at 582 (quoting Austin v. Univ. of Or., 925 F.3d 1133, 1139 (9th Cir. 2019)). "A process under which the adjudicating panel poses questions to witnesses is not 'so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation.'" Univ. of Ark.-

---

new evidence at least two days before the hearing." But Doe fails to identify the evidence at issue and cites only to his third amended complaint in support of his argument. See United States v. Golliher, 820 F.3d 979, 984 (8th Cir. 2016) ("Rule 28(a)(8)(A) of the Federal Rules of Appellate Procedure requires an appellant's argument section to include citations to the parts of the record on which the appellant relies. We have in the past refused to consider arguments not supported by proper record citations." (cleaned up) (quoting Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1055 n. 14 (8th Cir. 2002))). We decline to consider Doe's argument because we cannot do so properly.

[7]Doe also reiterates his arguments from Section III. Because the district court did not err in granting qualified immunity to the University officials, we do not address those arguments here.

Fayetteville, 974 F.3d at 867 (quoting Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 69 (1st Cir. 2019)). Procedural due process rights do not guarantee "all of the formal procedural requirements of a common law criminal trial." Id. at 868 (citing Gorman v. Univ. of R.I., 837 F.2d 7, 16 (1st Cir. 1988)).

Frost conducted the examination of all witnesses at the hearing, and Doe does not challenge this procedure.[8] Rather, Doe identifies a list of questions he submitted but were not asked, which he alleges resulted in a "material[ly] flaw[ed]" hearing process.[9] A review of the record indicates that Frost asked questions that addressed the topics underlying Doe's questions.[10] Moreover, Doe's questions were almost all in the form of impeachment intended to discredit the Complainants by emphasizing perceived inconsistencies in their interactions with Doe. As Frost explained, her role as adjudicator was "to collect information," not to cross-examine witnesses as an

---

[8]Section 12(H)(7) of the University Student Judicial Procedure allows the "accused student . . . [to] suggest questions to the adjudicator," but "[t]he adjudicator has discretion to determine the questions posed." Similarly, Section 12(H)(8) advises "[i]rrelevant, immaterial, or unduly repetitious evidence should be excluded."

[9]Doe contends that Frost "promised to ask all questions given to her before the hearing[]" and then "reneged on this promise," but we find no support for this assertion in the record.

[10]For example, Doe claims Frost did not ask Complainant 1 the following question: "Please describe your time with [Doe] in the Lab on October 7, 2016. If you were harassed and assaulted by [Doe], why did you decide to spend time with him alone after lab meeting got over?" But Frost did ask Complainant 1 a substantially similar question: "After the events of August 31st, 2016, did you continue to be in the lab alone with [Doe] in the evening hours? . . . And would that happen often? Not so often?" Doe also requested that Frost ask Complainant 1 about specific playful text message conversations she had with Doe. Instead, Frost asked: "Did you try to remain lighthearted after the events of August 31st? . . . Did you laugh with him? Did you joke with him? Did you try to pretend nothing had happened? . . . So you were . . . trying to maintain a relationship with him. Why?"

-14-

advocate for either side. It was within Frost's discretion to reframe the parties' submitted questions to fit her role as adjudicator. In any event, Doe has not explained how asking his particularly worded questions would have resulted in nonduplicate answers that were "material to the truth-finding process." Univ. of Ark.-Fayetteville, 974 F.3d at 868. We find no material procedural flaw in Doe's hearing.[11]

Doe received adequate notice of and was present throughout his hearing where he testified and was represented by counsel; and Doe's counsel offered and objected to exhibits, submitted questions to the adjudicator, had the opportunity to call witnesses, and presented a closing argument. At the end of the hearing, Frost invited Doe to provide any additional information he believed would assist her in the decision. Doe fails to show a genuine issue of material fact as to whether he had the opportunity to be heard at a meaningful time and in a meaningful manner. See Mathews, 424 U.S. at 333.

The district court properly granted the University's motion for summary judgment on Doe's remaining procedural due process claim.

---

[11]Doe also argues that Frost's questioning was designed to "deflate [his] credibility while inflating the [C]omplainants' credibility." See Haidak, 933 F.3d at 70 ("Efforts . . . to put a witness 'at ease,' when applied only to a complaining witness, helped render potentially unfair the proceedings in another recent [First Circuit case]." (citing Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018))). But Doe cites only his third amended complaint in support of this assertion, and, even there, he provides only one example of Frost's disparate questioning: Doe claims Frost asked him whether he asked a Complainant for consent before kissing her, while Frost asked the Complainants "about both verbal and nonverbal consent." This single example is insufficient to demonstrate a violation of Doe's right to due process. Moreover, Frost's questioning probed whether the Complainants may have given affirmative, nonverbal consent to their sexual conduct with Doe, even if they had not consented verbally.

V.

The judgment of the district court is affirmed.

_____